ANDREW MOOK et al., plaintiff-appellants; M. HAVILAND O'HERN et al., intervenor-appellants, v. SIOUX CITY et al., appellees.

No. 48309.

(Reported in 60 N.W.2d 92)

September 22, 1953.

A. H. Bolton, of Sioux City, for appellants.

Thomas J. Griffin and Lowell C. Kindig, both of Sioux City, for appellees.

Bliss, J.—Twenty-five documentary exhibits—some voluminous—not set out in the printed record, consisting of leases,

plats, resolutions, deeds, letters, reports, and miscellaneous matters, have been certified to the court. The facts, as shown by the exhibits and printed record, being in our judgment controlling in the determination of this appeal, we set them out rather fully.

Sioux City, population about 84,000, operates under the commission plan of government. In 1938 it established the Sioux City Municipal Airport, having an area of 332 acres. By April 28, 1942, the city had enlarged the area of the airport to in. excess of 1400 acres. On that date, Sioux City, as lessor, executed a written lease of the airport to the United States of America, to be used "as an air base, airport, cantonment, training school and military reservation." The term of the lease began April 28, 1942, and terminated June 30, 1947. The rental for the period was $1.00. At the option of the Government (lessee) the lease was renewable from year to year at an annual rental of $1.00, with the proviso that such occupancy should not extend beyond June 30, 1967. During World War II the airport was used as an operational base for heavy bombers. The lease was authorized and approved on January 29, 1943, by resolution of the city council, which recited that the lease "carries out the intent of a written commitment executed by the City to the United States of America under the Provisions of Resolution No. Q-10384 wherein the City offered to acquire a certain tract of real estate and to lease same to the United States of America for use as an Air Base", which real estate has been acquired, and the construction of the Army Air Base is practically completed.

On August 22, 1947, Sioux City, as lessor, leased to the Government twenty-four buildings at the airport, with floor space of 128,073 square feet, and a tract of land containing 549,910 square feet, with joint use with the lessor of the flying field, and full access to all of the premises, for "Office and Storage Space and Flying Rights for the Air National Guard of the State of Iowa." The term of the lease was to June 30, 1948, and thereafter unless the Government gave a 30-day notice of termination, but in no event was to extend beyond June 30, 1952. The city was to continue to furnish maintenance to all roads, streets, runways, and taxiways and adjacent sodded areas, including snow removal, lighting, wind tetrahedron, fire protection, water, and

sewage disposal. The Government was to keep all buildings and equipment in good repair, and it had the right at its expense to make alterations, attach fixtures and erect additions to buildings, and other structures, which were to be the property of the Government and removable by it at its option. This lease was approved by the city by Resolution and passed September 12, 1947. The Corporation Counsel of Sioux City gave written opinion to the War Department of the Government at Omaha of the city's right to execute the lease under section 330.12 of the 1946 Code of Iowa.

This lease was modified by Supplemental Agreement No. 1, dated April 27, 1948, and by Supplemental Agreement No. 2, of March 1, 1950, each of which was approved by a resolution of the city council. A third modification and agreement, supplemental to the original lease of August 22, 1947, was executed by the city and the Government on November 19, 1951, which recited that, whereas: the Air National Guard of the State of Iowa had now been federalized and was a part of the U. S. Air Force; and certain additional buildings, lands, equipment, and facilities had been needed by the Government, which Sioux City was willing to provide, and accordingly having consented to amend the agreement to provide the U. S. Air Force with the use of the premises, it was agreed by Sioux City and the Government that certain deletions from and additions to the original lease should be made, and that the Government should have the exclusive use, subject to certain rights of Morningside College, of approximately 893.82 acres of land, which the Government had previously acquired by condemnation in the Federal District Court; and joint and concurrent use with the lessor and those holding under it of all of the remainder of said airport property, as shown on a map of the airport, attached to the agreement, containing approximately 1434 acres, except certain designated portions thereof reserved for the exclusive use of the lessor. The property leased was to be used for military purposes, offices, storage, and flying rights of the Air National Guard of Iowa, and of the U. S. Air Force.

The term of the lease was to continue from year to year until terminated by the Government, but in no event beyond

June 30, 1977. The Government was to provide maintenance for the 893.82 acres and the buildings and facilities thereon, and both parties were to contribute to the maintenance of the 1434 acres and improvements and equipment on it. The lessor, in conjunction with the Civil Aeronautics Administration, was to complete the construction of the new administration building, costing about $450,000, including a central control tower, all on the 1434 acres.

On December 28, 1951, the Sioux City council by resolution passed and approved the said third supplemental agreement. This resolution recited that, under previous agreements between Sioux City and the Government the latter had recapture rights in the airport properties and it had decided to reactivate the Sioux City Municipal Airport as a part of the national defense program; and that an agreement between Sioux City and the United States Air Force for the joint and concurrent use of the runways and other facilities of the Sioux City Municipal Airport filed in the office of the city clerk was then before the council and should be approved, in the best interests of the city and in the furtherance of the national defense. This agreement was also approved by said resolution of December 28, 1951.

On December 27, 1948, the United States of America, acting through the War Assets Administration, pursuant to Reorganization Plan One of 1947 and the Surplus Property Act of 1944, first party, and the City of Sioux City, second party, executed an indenture, designated a quitclaim deed, by which the first party conveyed all its right, title and interest in property described as "Airport land", with its legal description fully set out, and being the approximately 893.82-acre tract of land condemned by the United States and mentioned in Supplemental Agreement No. 3, supra. The instrument also released all of the Government's interest under its lease of April 28, 1942, of the 1434.52 acres of airport land owned by Sioux City, and also conveyed to the city all its buildings and improvements of every kind on all real estate covered by the instrument, and all fixtures, equipment and personal property of every kind on the airport land, with the exception that the Government might remove all such equipment and personal property which could be taken

without material injury to the land or structures thereon, or was not necessary to the operation of the airport.

The instrument also reserved to the Public Housing Administration and those holding under it the use and occupancy of certain specified properties.

The transfer of the property to Sioux City was subject to a number of conditions, among them the following: (1) The property would be used for public airport purposes on reasonable terms and without unjust discrimination; (2) the airport and its facilities would be maintained at all times in good and serviceable condition, and all aerial approaches and exits would be kept adequately clear; (3) the Government through any of its agents or employees would at all times have the right to make nonexclusive use of the landing areas without charge; (4) during any national emergency declared by the President or Congress the Government would have the right to make exclusive or nonexclusive possession, use or control, without charge, of the airport or such portion as it might desire, provided that it would be responsible for the entire cost of maintaining such part of the airport as it used exclusively, and a fair share of the maintenance cost of such property as it might jointly use with others; (5) the airport property could not be disposed of without the written consent of the Civil Aeronautics Administration; (6) if any of the conditions, reservations or restrictions of the indenture were not met or observed by the second party, or any subsequent transferee, the title and right of possession and all other rights transferred would revert to the first party, sixty days following the demand therefor. The city approved this indenture and quitclaim deed on December 28, 1948, and again on January 4, 1949.

In the third supplemental agreement executed November 19, 1951, referred to hereinabove, was a provision that the Government might terminate it by a 30-day notice, "provided, however, that the termination * * * shall in no manner waive, cancel, or abridge the rights reserved to the Government under a certain quitclaim deed dated 27th of December, 1947."

Certain of the leases and the quitclaim deed gave the Government the right to recapture such parts of the airport as it

might wish to use exclusively, or nonexclusively, with its Air Forces. A resolution of the city passed December 28, 1951, recognized this fact and also that the Sioux City Municipal Airport had been reactivated for use by the armed forces of the Government, and the city had been directed to notify all civilian occupants of the property to vacate.

There had been a number of conferences between officers of the city and the officers of the Air and Military Forces of the Government with respect to the desire of the Government to enlarge and reconstruct the airport as an Air Force Base, and as a strategic point for defense of the nation against air attack. From the Government's occupancy of the airport under lease in 1942 and the years following it had always been a participant with the city in the operation of the airport, although the extent and degree of the Government's activities varied at times. Lately the Air Force has been operating an Air Defense Command Fighter Intercepter Squadron at the airport.

The city had expended about $700,000 in the establishment of the 332-acre airfield in 1938, and its upbuilding and expansion to an area of over 1400 acres in 1942, when it was first leased to the Government. During the occupancy and control in World War II the Government spent $13,500,000 on improvements. The three concrete runways now on the airfield were constructed at that time by the Government. Each runway is 300 feet wide. The northwest-southeast runway is 6615 feet long; the north-south runway is 6600 feet long; and the northeast-southwest runway is 6890 feet long. When the Government conveyed the approximately 894 acres which it had condemned, and returned the approximately 1434 acres which it had leased, for a total 2328 acres, to Sioux City, the Government tore down the officers' and bachelors' quarters, officers' club, WAC headquarters, barracks for colored troops and enlisted men, and hospital, of a total value of $4,000,000, leaving about $9,000,000 in other improvements. At the time of the trial the Government was constructing a 900-foot extension to the northeast-southwest runway.

A partial transcript of a Committee Hearing in the House at the First Session of the Eighty-second Congress, relative to the

reactivation of the Sioux City Airport, was in evidence. It is stated therein: "The planned use of the base is for an operational unit. Present facilities at the base are inadequate to support this planned mission and the Department of the Air Force has no suitable facilities at any other base that might be used for the purpose proposed for this base. The Government invested approximately $13,500,000 at this base during World War II. The runways system and many of the buildings still exist but must be augmented with new 10-year-life construction to meet the requirements of the planned mission. The present request for the base is $1,746,000."

It appeared from the preliminary conferences between the city and the Government officers that there had been great changes and advancement in the construction and operation of military, civil and commercial airplanes. Present-day airplanes are much larger, heavier and faster. These changes make it necessary for great corresponding changes in airfield construction and operation. Heavier, stronger, wider, and much longer runways are needed. Some of the airplanes require 12,000- to 14,000-foot runways. Commercial airlines are acquiring jet planes, and they require longer and stronger runways. It requires 8000 to 9000 feet to stop many of the jet aircraft. Airplanes have increased in weight to hundreds of thousands of pounds. Government regulations require a safety factor of eleven- or twelve-thousand-foot clear zones at the end of runways. Expert witnesses experienced in both military and civil and commercial aviation testified for both sides. One witness, Col. Frank J. Drittler, in the Air Force stationed at Omaha and responsible for the installation and construction of air bases in nine states, testifying for defendants, said: "The trend is for larger aircraft, and we see no stopping in the future and it means that airports have practically the same rate of obsolescence as the aircraft themselves. * * * In World War II a 6000-foot runway was pretty decent, but today both civil and military airports look to runways of 8000 to 10,000 feet. * * * airline pilots' association now recommends runways of 10,000 feet. * * * One runway at Sioux City will sustain 50,000 pounds gross weight in the center 150-foot space and 10,000 pounds on the 75-foot strip at

each edge of the 150-foot center. The other runways will sustain 35,000 pounds. * * * The Sioux City runways might support some commercial planes for a one or two time landing, but would not support for continued use the DC-4, DC-6 or the Constellation. The DC-4 weighs 65,000 pounds; the DC-6 from 93,000 to 105,000. The Constellation weighs 110,000 to 150,000 pounds, and a B-47 or a B-36 would go right through the Sioux City runways. The military would like to see five miles of clear zone for approach and glide angle at runway ends, and civilian aviation circles are following this pattern."

Colonel John A. Carey in the United States Air Force has been commander of the Sioux City Air Base since February 14, 1952. As a witness for defendants, he testified: "World War II runways are inadequate for present or new commercial aircraft. * * * The Air Force is currently using obsolete aircraft at Sioux City because the runway facilities are inadequate for the latest types. They are not long enough to handle the heaviest types of military planes under normal loads. Small jets are used in the training at the base here—fourteen thousand pounds. The proposed aircraft will run over one hundred thousand pounds."

These matters were all discussed and made known to the city council before the adoption of the resolution which plaintiffs challenge. A plan of the airport expansion was furnished the council. It was advised that about 1700 houses would be needed off the base, and approximately $20,000,000 would be spent by the Government in the immediate improvement and enlargement of the Air Base, and that $35,000,000 would probably be spent under a long-range program; that the Air Force would have exclusive control of the airport, but there would be joint and concurrent use of the airport and its facilities by commercial lines; that the city would be at no expense other than to buy any additional land. The council knew that the Government, as had been its practice elsewhere, had conveyed to the city, without consideration or cost, approximately 900 acres of land with most of its improvements, and were informed that if the Government canceled its lease of the property all property belonging to the lessor would be returned subject to normal deterioration, and improvements made by the Government would remain with

the lessor without cost to it. On this point, Colonel Drittler testified: "Many of the plans for expansion are deemed security, and I cannot go into those. If the expansion goes through, when the Air Force terminates the lease Sioux City will have a facility attractive to industrial and civilian use. The policy is to turn back to the cities most or all of the facilities constructed by the Air Force. The proposed runway improvement would be adequate to handle present or projected types of commercial aviation. The Air Force will maintain the entire facility during the life of the lease. * * * The United States Air Force will have to take over the use of the new Administration building for security reasons. The Air Force has agreed to save Sioux City harmless from any recovery by the Civil Aeronautics Administration for any contribution made by it for the construction costs of this new building. * * * Through the Secretary of the Air Force there will be an agreement allowing civilian use of the runways, taxiways and aprons for the life of the lease between the Air Force and the city."

The Braniff Air Line is the only commercial line operating regularly out of the Sioux City Municipal Airport. It has fourteen flights a day out of the airport, with a comparatively high per capita basis. The heaviest commercial aircraft on the field is the Convair, which carries forty-four passengers. Braniff also carries the mail. This company pays the city about $600 monthly for hangar rental and landing fees. About 800 to 1000 acres of land on the airport is rented for farming purposes, and brought in rental of $130,000 during the year preceding the trial. The Civil Aeronautics Administration keeps a man in the control tower at all times to direct civilian air traffic. The length of the runways compare favorably with those at the municipal airports in Des Moines, Kansas City (Mo.), and Chicago. It is the largest airport in Iowa. There is no evidence of any inadequacy of any facilities of the airport to accommodate the present or past air traffic of the Braniff Air Line. And there is no evidence of any difficulty, conflict or inconvenience in the joint use of the airport by the commercial, civilian and military airplane operation and traffic. The Air Force is currently paying 95% of the maintenance of the runways.

When the city council was informed of the desire of the Government to make increased use of the airport and to establish it as an active air base, by enlarging it to the extent of 1600 acres—1300 acres within the base and 300 more for aviation easements—it and other civic organizations in the city became active in promoting the Governmental purpose. The mayor, the presidents of the Chamber of Commerce, the Industrial Development Council, the Trades and Labor Assembly, Woodbury Taxpayers Conference, and the C.I.O. Council joined in a letter to the secretary of the Air Force, at Washington, D. C., strongly approving the project and setting out the many advantages of Sioux City for the success of the endeavor. Many other organizations wrote letters of approval to the mayor and council. From many other statements in the joint letter, we quote:

"Sioux City, Iowa, warmly invites the United States Air Force to occupy its municipal airport. In doing so, the city pledges full cooperation with and complete support of the Air Force and its activities. It welcomes this opportunity to serve the nation and particularly the Air Force in the present crisis. * * *

"We understand that, if the plan contemplated becomes a reality, there will be a substantial expansion of the air base and its activities, requiring the expenditure of approximately $35,-000,000, and resulting in the stationing at the air base of approximately 7500 officers and men and 500 civilian employees, with a monthly pay roll of about $2,000,000 per month. * * *."

On October 7, 1952, the council of Sioux City passed a resolution, reciting in substance that whereas: (1) The United States had offered to enter into a nonexclusive lease with the city for the joint use, possession and control of its Municipal Airport, as enlarged by an addition of 1600 acres to it, whereby the operation of the airport will be preserved for civilian aviation; (2) the 1600 acres to be acquired by the city as deemed suitable, desirable and essential for the development, improvement, operation, and maintenance of said airport, and reasonably necessary to fulfill the immediate and foreseeable future requirements of the city with respect to said airport; and (3) the city can presently provide for said enlargement of the airport and all the install-

ments and equipment therefor without cost to it, other than for the acquisition of said additional land, it is therefore resolved that the enlargement of the airport by said 1600 acres is for a public purpose and is a matter of public need; that the city begin proceedings to purchase or condemn said acreage and finance its purchase by issuing airport bonds in anticipation of the collection of taxes for that purpose; and that the legal department and the finance department respectively of the city take the necessary action to condemn said additional land, and to finance its acquisition with airport bonds.

The petition of plaintiffs, in which intervenors joined, alleged, substantially as stated herein: the various steps in establishing and enlarging the Sioux City Airport until it is the largest municipal airport in Iowa and amply sufficient for all foreseeable airport needs; the passage of the resolution by the city council on October 7, 1952, for the acquisition of 1600 acres of land owned by plaintiffs was in disregard of the rights of plaintiffs and intervenors, and of the limitation of the council's power to condemn; that said resolution was passed at the insistence of organized groups of laborers, businessmen, and others hopeful of personal gain from the establishment of the airport base; that the resolution proposes to take plaintiffs' land and all other airport real estate and lease it for nonmunicipal airport purposes; that the resolution shows that city does not own an airport and the airport property is not used for municipal airport purposes or subject to city control, but the Federal Government will have joint control of it, and in the event of a war emergency the city will be deprived of the property; the resolution attempts to condemn the land for unauthorized, nonmunicipal purposes solely to create a federal army air base; that the resolution was passed on the erroneous theory that the Federal Government would improve the land acquired and the city would ultimately benefit by receiving the improved property; that plaintiffs lost land in the original establishing of the airport and by this resolution will suffer additional loss; that the resolution was not passed in good faith but as a subterfuge to enable those privately interested to make a profit from increased pay rolls and additional consumers; that Sioux City no longer has an airport and has no need of additional land as the airport

is controlled by the Government; that defendants have not filed any plans or specifications with the proper authorities; that Sioux City now has more airport facilities than it will need for generations to come, and additional land is not required nor intended for municipal airport purposes, and every recital in the resolution in relation to the municipal public use, necessity and reasonableness are sham and simply cover up by subterfuge the establishment of a United States Air Base for purposes of national character; the resolution was adopted not for reasons stated therein but with the hope that Government money would be spent which would inure to the benefit of merchants, contractors, laborers, and other private citizens of the vicinity; that the proposed condemnation is illegal and void and any tax levied to pay bonds issued would be for purposes foreign to the laws of Iowa.

The preceding statement is a much condensed, but correct, summation of the petitions. Defendants' answer is mainly a denial.

The district court reviewed the evidence briefly and the pertinent statutes in chapter 330 of the 1950 Code in its Findings of Fact and Conclusions of Law and decreed the dismissal of the petitions because the allegations contained therein on which plaintiffs and intervenors based their right to the relief prayed for had not been established, and they had not sustained the burden upon them of overcoming the presumed legality of the challenged resolution.

We agree with the judgment and decree of the district court.

■■ I. The statutory provisions pertinent to the establishment, maintenance, enlargement, and operation of municipal airports are found in chapter 330 of the 1950 Code of Iowa, entitled "Airports", and in chapter 328 of said Code. The first Federal aid for the expansion of aviation was extended by the Civil Works Administration in 1933. By 1939 over $325 million were made available for airport maintenance and expansion. This aid, begun as an emergency measure, was continued under the Civil Aeronautics Act of 1938, and by the end of World War II the total Federal expenditures for civil airports had reached $705 million. (Exhibit 22, Report of the President's Airport Commission (May 16, 1952), Part VI.)

Section 330.13, Iowa Code of 1950, authorizes the use of Federal aid in the promotion, establishment, enlargement, maintenance, and operation of municipal airports, and other air navigation facilities under the rules, regulations and laws of the United States. A like statute is 1950 Code section 328.14.

Plaintiffs contend, with repeated and vigorous insistence, that the defendant city and its mayor and commissioners, and other selfish individuals and interests, by "subterfuge" and "cover-up", are seeking to effect the unlawful taking of plaintiffs' land. That is the sum and substance of their pleaded allegations, and the theme of their argument in this court. The allegations of plaintiffs' petition are not. of facts, but are merely surmises and conclusions of the pleader without any support in the record or in the evidence. Consequently, their argument carries no conviction.

For ten years prior to the adoption of the resolution on October 7, 1952, the Government Air Forces had occupied and used the Sioux City Airport under different municipal administrations, to the knowledge of the public generally. The past and present administrations of Sioux City have co-operated with the Government in the use of the municipal airport in the nation's defense, which included the protection and benefit of Sioux City. As stated in Exhibit 22, supra, page 25: "In the short span of fifty years since the invention of the airplane, aviation has become essential to our national defense and indispensable to our national economy. Although only a fraction of our total population is directly engaged in the design, manufacture or operation of aircraft, every citizen is an indirect beneficiary."

In accord with the quotation, section 330.15, Code of 1950, states: "Deemed as public use. Any property acquired, owned, controlled, or occupied for the purposes enumerated in this chapter, shall be and is hereby declared to be acquired, owned, controlled, and occupied for a public purpose and as a matter of public need * * *."

The proposed condemnation of the land of plaintiffs does not violate any constitutional or statutory provision, nor any principle of law bearing upon the subject of eminent domain. The enlargement of the airport for the joint use of the Government, Sioux City, civilian and commercial aviation was a matter

for the exclusive determination of the city council in its legislative function. Having the power to do so under the law and statutes, and there being not the slightest evidence of fraud, oppression, illegality or abuse of power or discretion, the courts will not interfere. Brush v. Town of Liscomb, 202 Iowa 1155, 1157, 211 N.W. 856; Porter v. Board of Supervisors, 238 Iowa 1399, 1404, 28 N.W.2d 841; Simpson v. Board of Supervisors, 180 Iowa 1330, 1341, 162 N.W. 824; Des Moines City Ry. v. Des Moines, 205 Iowa 495, 503, 504, 216 N.W. 284; Long v. State Highway Comm., 204 Iowa 376, 213 N.W. 532; Chicago G. W. Ry. Co. v: Mason City, 155 Iowa 99, 105, 135 N.W. 9; Pell v. Marshalltown, 241 Iowa 106, 111–114, 40 N.W.2d 53.

The reactivation of the airport by the Government will require the execution of a lease between Sioux City and the United States. No such lease had been executed at the time of the trial. Plaintiffs insist commercial aviation may be seriously interfered with. There is no evidence of such interference under prior leases, and the Government representatives in their conferences with the city officers have stated that joint use of the airport and its facilities by commercial and Air Force aircraft will be provided for. The matter is not before us and we cannot presume that the rights of commercial and other civilian air traffic will not be respected and agreed upon in the lease or agreement entered into.

The judgment and decree of the district court is—Affirmed.

All JUSTICES concur.