Jerry **MAIATICO** and Matomic Operating Co., Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 16357.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 18, 1962.

Decided March 8, 1962.

Mr. George P. Lemm, Washington, D. C., for appellants.

Mr. A. Donald Mileur, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Ramsey Clark and Mr. Roger P. Marquis, Atty., Dept. of Justice, were on the brief, for appellee.

Before EDGERTON, WASHINGTON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

The Government on January 4, 1961 filed in the District Court its complaint for the taking of certain property in the District of Columbia under power of eminent domain and for the ascertainment and award of just compensation for that taking. At the same time, the Administrator of General Services filed a Declaration of Taking, and deposited in the Registry of the District Court the sum of $9,900,000 as estimated just compensation. The Government's motion for surrender of possession of the property was granted, and appellants' challenge to the Government's claim of right to condemn was rejected. As to such rulings, another division of this court allowed an interlocutory appeal which had been certified pursuant to 28 U.S.C. § 1292(b).[1]

The property in question, located at 1717 H Street, N. W. in the District of Columbia, is a large, eleven story, modern office building known as the Matomic

---

1. This court's order of June 30, 1961 in pertinent part reads:

"Ordered by the court that an appeal from the order of the District Court entered May 10, 1961, denying defendant's motion to dismiss is allowed and that an appeal from the order of the District Court entered herein May 10, 1961 denying defendant's motion for reconsideration of order of March 10, 1961, and granting plaintiff's motion for surrender of possession and motion to strike the defendant's answer, is allowed."

We omit reference to earlier, intermediate procedural steps, not now relevant.

Building, which the Administrator of General Services specified is to be used for the housing of federal agencies. In the District Court, it was conceded by the Government that the premises are not within the "taking area" as defined in the Public Buildings Act of 1959, 73 Stat. 479, 481,[2] which, the Government argued, does not apply to the acquisition of the Matomic Building. The Government agreed that if General Services "were going to build a building within those boundaries, a specific authorization would be necessary. We are not building a building."

Appellants countered that the Government had no authority to acquire the building for it had not obtained approval so to do "from the Committees on Public Works of the Senate and House of Representatives as it is required to do by the Independent Offices Appropriation Act, 1961, and the Public Buildings Act of 1959, 40 U.S.C.A. § 606(a)."[3]

The Government concedes that the respective Senate and House Committees on Public Works had held no hearings with reference to the acquisition of the Matomic Building and had not adopted resolutions approving its acquisition. The Government argues that such steps and such approval were not required, again asserting that the provisions of the Public Buildings Act of 1959 do not here apply. We turn accordingly to con-

sideration of that Act and its possible applicability to our problem.

Congress passed the Public Buildings Act of 1959[4] with the "primary purpose"[5] of providing a "basic statute which would vest in the Administrator of General Services authority and responsibility for acquiring * * * public buildings [as defined in the Act] and acquiring the necessary sites * * * in connection therewith * * *."[6] It was noted that over a period of 55 years legislation had become a "patchwork." The Administrator had been by-passed by various agencies. A thorough study had been made of various enactments which had previously pointed up the congressional plan, culminating in the congressional conclusion that authority in the public buildings field, with certain exceptions not pertinent here, should be centralized in the General Services Administration.

The Act authorized the Administrator to acquire any building and its site by condemnation or otherwise, in order to carry out the purposes of the Act, but strictly in accordance with its provisions. It was provided that no appropriation be made to acquire any building involving an expenditure in excess of $100,000 unless the acquisition be approved by resolutions adopted by the respective Committees on Public Works of the House and Senate.[7] The Administrator was

---

2. Sec. 8(a), 40 U.S.C.A. § 607(a) in pertinent part reads:

"In carrying out his duties under this Act, the Administrator shall acquire real property within the District of Columbia exclusively within (1) the area bounded on E Street, New York Avenue, and Pennsylvania Avenue Northwest, on the North; Delaware Avenue Southwest on the east; Virginia Avenue and Maryland Avenue projected in a straight line to the Tidal Basin, Southwest, on the south; and the Potomac River on the west * * *."

3. Sec. 7(a), 73 Stat. 480, 40 U.S.C.A. § 606 (a), provides in pertinent part:

"In order to insure the equitable distribution of public buildings throughout the United States with due regard for the comparative urgency of need for such

buildings, except as provided in section 4, no appropriation shall be made. * * * to acquire any building to be used as a public building involving an expenditure in excess of $100,000 * * * if such * * * acquisition has not been approved by resolutions adopted by the Committee on Public Works of the Senate and House of Representatives, respectively * * *."

[Sec. 4 applies only to alteration of public buildings or the acquisition of lands necessary to carry out an alteration.]

4. 73 Stat. 479, 40 U.S.C.A. §§ 601–615.

5. H.R.Rep. No. 557, 86th Cong., 1st Sess. 2 (1959).

6. Ibid.

7. Supra note 3.

required to transmit to the Congress and secure advance approval of a prospectus of each proposed project including (1) a description of the building to be acquired, (2) its location and estimated cost and other details,[8] and even as to an *approved* project, the Act imposed a strict limitation upon a possible increase of not to exceed 10% above the estimated maximum cost. In particular, as applicable to the District of Columbia, the Administrator was commanded to acquire real property *exclusively* within the area defined in the Act,[9] and conformably generally to the L'Enfant plan for the "Federal City."

It will be seen that the Administrator of G. S. A. was made the executor of the congressional plan, with wide powers as to any project, once it be approved by the standing Committees on Public Works, but subject to their firm control.

Against that background of such recent legislation, especially as applicable to the District of Columbia, the House received the bill which was to become the Independent Offices Appropriation Act, 1961. Under the heading "General Services Administration," funds had been provided for 18 construction projects and 2 major renovations in accordance with prospectuses already approved by the House Committee on Public Works. Three projects for the District of Columbia included in the bill had not received advance approval from that standing committee. A point of order raised against those projects, calling for some $65,000,000, was sustained, and they were deleted. The bill then went to the Senate.

The Administrator proposed to the Senate Subcommittee on Appropriations an amendment which would allow for four District of Columbia projects, Federal Office Building Eight, $15,105,000, FOB Nine, $20,031,100, FOB Ten, $38,326,500 and a Court of Claims building, $6,375,000. He recommended in order to avoid further points of order that Congress recognize the principle that it "can appropriate funds in advance of the approval of projects by its Committees on Public Works, notwithstanding the provision of section 7(a) [supra note 3] of the Public Buildings Act of 1959. Further, that by limiting the use of any funds so appropriated to projects thereafter approved by the said committees, it can achieve the significant purpose of the cited section 7(a)." [10]

The bill was thereupon amended. As amended, and including the four District of Columbia projects, the pertinent portion of the Act before us reads:

## "GENERAL SERVICES ADMINISTRATION

\* \* \* \* \* \*

### "CONSTRUCTION, PUBLIC BUILDINGS PROJECTS

"For an additional amount of expenses, not otherwise provided for, necessary to *construct* public buildings projects and *alter* public buildings by extension or conversion where the estimated cost for a project is in excess of $200,000 *pursuant to the Public Buildings Act of 1959* (73 Stat. 479), including equipment for such buildings, $165,441,000, to remain available until expended: *Provided,* That the *foregoing amount* shall be available *for public buildings projects, subject to approval of any such project by resolutions adopted by the Committee on Public Works of the Senate and House of Representatives, respectively,* at locations and at maximum construction im-

---

8. Including a "statement by the Administrator that neither federally owned space is available nor rental space is available at a price commensurate with that to be afforded by the proposed action \* \* \*." H.R.Rep. No. 557, supra note 5, p. 9.

9. Supra note 2. And see D.C.Code §§ 16-619—16-644 (1961) governing the acquisition of land in the District of Columbia for use of the United States.

10. Hearings Before the Subcommittee of the Committee on Appropriations, Senate, 86th Cong., 2d Sess., "Independent Offices Appropriation, 1961," p. 153 (1960).

provement costs (excluding funds for sites and expenses) as follows: [Then follows a list of the included projects.]" 74 Stat. 431. (Emphasis added.)

Thus Congress appropriated $165,441,-000, to be available for "public buildings projects," but subject to approval of "any such project" by the respective standing committees. Fully recognized and incorporated by reference were the provisions of the Public Buildings Act of 1959.[11] Only in accordance with its terms was the appropriated amount made available to General Services Administration. From the same Act the Administrator derived his duty and authority to expend the fund so appropriated.

█ The Government tells us on brief: "It is, of course, the 1961 appropriation on which the United States relies for its authority to take the building at 1717 H Street, N. W." We find no evidence that the Matomic Building acquisition was ever approved by the standing Committees on Public Works. We fail to find that the Administrator submitted to those committees the prospectus called for by the Public Buildings Act. The premises are outside the "taking area" defined in the Act. In short there is apparent no compliance with that Act or with the language of the appropriation to which the Government points and upon which it relies. The appropriating language provides an amount "necessary to construct public buildings projects and alter public buildings," nothing else. The specific projects are itemized to show their respective "maximum construction improvement costs (excluding funds for sites and expenses)." The Matomic Building is not listed. Four other District of Columbia projects are. The 1961 Appropriation Act does not sustain the Government's position.

11. Supra notes 2 and 3.

12. If we were to assume that the maximum construction improvement cost had been overstated in each instance by 20%, there would have remained available to the General Services Administration the

█ The Government says that the appropriation to *construct* and *alter* public buildings yielded certain "saved funds." Questioned during argument, Government counsel conceded that if the stated cost of each project had simply been overestimated in the Administrator's request, the surplus funds would be classified as "saved." [12] Even so, the appropriation would not on that account be available without congressional approval to condemn the Matomic Building. Granting that the Administrator even under the Public Buildings Act of 1959 has been accorded great latitude, he still must comply with the Appropriation Act. The mere fact that some balance remains from funds appropriated for one purpose gives him no authority to expend that balance for an unauthorized purpose.

Lacking either authorization to acquire the Matomic Building or an appropriation allocable to provide just compensation for the owner, having gone outside the "taking area" within which his "exclusive" authority to acquire sites in the District of Columbia had been confined, it is argued on brief that the Administrator nevertheless had been invested with a "large amount of administrative discretion." It is claimed that funds made available to G. S. A., appropriated for public buildings projects, each of which required the approval of the standing committees, might, without such approval, be utilized "to procure office buildings [the Government] was renting anywhere in the United States for occupancy of relatively permanent establishments of the Government," upon determination by G. S. A. that such acquisition "would be more economical than renting and less expensive for the Government than construction of new buildings." The Supplemental Appropriation language discloses no such limitation or statement of pur-

amount of $33,088,200. It is to such "saved funds" the Government now points as the source upon which it would draw for the $9,900,000 deposited in the Registry of the District Court in this case, to provide just compensation for the owners of the Matomic Building.

pose that the Administrator, when acquiring buildings, condemn only those already under rental. Surely if Congress intended the Administrator to possess the vast discretion now asserted, it could clearly have said so. We find no evidence that any agency had previously asserted or been accorded such power.

Discretion exercised to permit such acquisitions would thus be unrestricted, freed from the limitations in all other respects applicable to public buildings projects which had been imposed by the Public Buildings Act of 1959 and by the Appropriation Act itself. Not in amount, not in purpose, not in the area of permitted acquisition or otherwise would there be a limitation upon the Administrator, if that argument be accepted. As predicate for this position the Government points to language in the Second Supplemental Appropriation Act, 1961,[13] which reads:

### "GENERAL PROVISION

"The second paragraph under the heading 'General Services Administration', subhead 'General Provisions,' in the Independent Offices Appropriation Act, 1961, is amended to read as follows:

" 'Appropriations under the heading "Construction, Public Buildings Projects" shall be available for (1) acquisition of buildings and sites thereof by purchase, condemnation, or otherwise, including prepayment of purchase contracts, (2) extension or conversion of Government-owned buildings, and (3) construction of projects for new public buildings approved pursuant to the Public Buildings Act of 1959.' "

Were we to accept the Government's contention, the foregoing text discloses,

when read in connection with the 1961 Appropriation Act, that $165,441,000 would thus be said to be "available," without reference to or approval by the standing committees of the House and Senate as to any of the public buildings projects, and without reference to any other statutory requirement imposed by Congress.

The foregoing provision supplants a general provision in the Independent Offices Appropriation Act, 1961, which had read:

"Appropriations under the head 'Construction, Public Buildings Projects' shall be available for acquisition of buildings and sites thereof by purchase, condemnation or otherwise, including prepayment of purchase contracts, or for *other approved* projects outside the District of Columbia." [14] (Emphasis added.)

When that provision was deleted and the substituted language [15] was inserted in the Second Supplemental Appropriation Act, the House Committee on Appropriations had reported only that "the amendment will enable [the Administrator] to use savings realized in the construction of public buildings to convert and remodel existing Government-owned facilities which from time to time become available for other Federal use or disposition as surplus property and which are economically adaptable for general purpose Federal space requirements."[16]

▉ The Government would have us say that the general provision of the Second Supplemental Appropriation Act supplants the limitations of the Public Buildings Act of 1959 and the Appropriation Act which had so carefully been linked to the former. Carried to its logical conclusion, the Government's construction would sweep away all pre-exist-

13. 74 Stat. 821, 826.

14. 74 Stat. 434.

15. Supra text and note 13.

16. H.R.Rep. No. 2166, 86th Cong., 2d Sess. 4, 5 (1960). The Congress thus was told that the amendment granted permission to use "saved" funds only "to

convert and remodel existing Government-owned facilities." The Senate committee's report is silent on the subject. We have not been cited to evidence in hearings on the Second Supplemental Appropriation Act, 1961, which might support the language of the House report, and our research has disclosed none.

ing requirements. Any such inversion of the purpose of Congress would be in direct conflict with the governing principle to be applied here. "However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. * * * Specific terms prevail over the general in the same or another statute which otherwise might be controlling.' Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 [52 S.Ct. 322, 76 L.Ed. 704]." [17] The general provision, at least as applicable to the acquisition of property in the District of Columbia, can not be seen to repeal the special legislation which Congress with great care had specified as governing here. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." [18] It is our duty whenever possible to reconcile provisions of varying statutes when and to the extent that conflict may appear. [19] We can not accept the proposition that the general provision in the Supplemental Act repealed—either directly or by implication—the specific provisions of the Appropriation Act as geared to the Public Buildings Act of 1959.

Cases [20] cited by the Government do not support the broad sweep now asserted, for in each of them pre-existing authorization by Congress may be perceived. All antedated the Public Buildings Act of 1959, and in any event, the property involved was not outside a limited and carefully defined "taking area" as is here the situation.

■ Nothing we have said is in derogation of the vast and admitted power of the Government for its own sovereign purposes to appropriate private property, [21] so long as the owner is awarded "that just compensation which the Constitution requires." [22] Despite appellants' allegations that the taking is unnecessary, it is not for us to determine whether or not a particular project be desirable. [23] That is within the power of the Congress, [24] however, subject to the right of the owners "to challenge the validity of the taking for departure from the statutory limits." [25]

That challenge has here been considered with great care. It is our conclusion that the taking was not within the area from which "exclusively" such acquisitions were required to be made. Since Congress has not been shown to have authorized the present taking of the Matomic Building, the District Court erred in not granting the appellants' motion to dismiss the complaint. The order will be reversed. Since by consent of the parties the fund pursuant to order

17. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 894, 88 L.Ed. 1163 (1944); cf. Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 228, 229, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957).

18. Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929); cf. American Security & Trust Co. v. Commissioners of Dist. of Columbia, 224 U.S. 491, 495, 32 S.Ct. 553, 56 L.Ed. 856 (1912).

19. Tri-State Motor Corporation v. Standard Steel Car Co., 51 App.D.C. 109, 110, 111, 276 Fed. 631, 632, 633 (1921).

20. Ivanhoe Irr. Dist. v. McCracken, 357 U.S. 275, 293, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); Seneca Nation of Indians v. Brucker, 104 U.S.App.D.C. 315, 262 F.2d 27 (1958), cert. denied 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959); United States v. Kennedy, 278 F.2d 121

(9 Cir. 1960); United States v. Advertising Checking Bureau, 204 F.2d 770 (7 Cir. 1953): Polson Logging Co. v. United States, 160 F.2d 712 (9 Cir. 1947); United States v. Threlkeld, 72 F.2d 464 (10 Cir.), cert. denied 293 U.S. 620, 55 S.Ct. 215, 79 L.Ed. 708 (1934).

21. United States v. Carmack, 329 U.S. 230, 236, 67 S.Ct. 252, 91 L.Ed. 209 (1946).

22. United States ex rel. T.V.A. v. Welch, 327 U.S. 546, 555, 66 S.Ct. 715, 719, 90 L.Ed. 843 (1946).

23. Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

24. Ibid.

25. Catlin v. United States, 324 U.S. 229, 240, 65 S.Ct. 631, 637, 89 L.Ed. 911 (1945); Berman v. Parker, supra note 23, 348 U.S. at 35, 36, 75 S.Ct. 98.

of the court has already been paid out, it seems to us desirable to delay the issuance of our mandate for a period of thirty days following the entry of our judgment.

Our order will be prepared conformably to the views herein expressed.

Reversed.