376 F.2d 266
 Joseph B. CRAWFORD et al.
v.
The UNITED STATES.
Rocco A. TRECOSTA
v.
The UNITED STATES.
Gail M. AANENSON et al.
v.
The UNITED STATES.
Harry W. AHO et al.
v.
The UNITED STATES.
Helen Phyllis ABRAHAMSEN et al.
v.
The UNITED STATES.
Esther Katrina BARNES et al.
v.
The UNITED STATES.
Edna T. ACKAL et al.
v.
The UNITED STATES.*
 No. 83-65.
 No. 93-65.
 No. 267-65.
 No. 449-65.
 No. 159-66.
 No. 212-66.
 No. 407-66.
 United States Court of Claims.
 March 17, 1967.
 
 Rocco A. Trecosta, pro se, in No. 93-65.
 Earl C. Berger, attorney of record, for plaintiffs in cases Nos. 83-65, 267-65, 449-65, 159-66, 212-66, and 407-66, Lorber, Vogel & Berger, of counsel.
 James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 SKELTON, Judge.
 
 
 1
 This is a suit brought by 2,975 plaintiffs for backpay, alleged to be due them as teachers in overseas dependents schools operated by the Department of Defense for the education of minor dependents of overseas personnel of such Department during the years 1959 through 1966, under the provisions of the Overseas Teachers Pay and Personnel Practices Act, 5 U.S.C. §§ 2351-2358 (1964), (hereinafter referred to as the Act or Public Law 86-91).
 
 
 2
 It is estimated by plaintiffs that this decision will affect some 20,000 overseas teachers whose claims amount to many millions of dollars.
 
 
 3
 For the purposes of this decision, the above-entitled seven cases have been consolidated inasmuch as the same basic issues are involved in all of them. The plaintiffs Joseph B. Crawford and Nell A. Walthers, No. 83-65, and Rocco A. Trecosta, No. 93-65, have moved for summary judgment and the defendant has filed a cross motion for summary judgment in all of the cases and they will be disposed of on the basis of such motions.
 
 
 4
 Prior to the years involved in these cases, the Congress did not enact any comprehensive laws with respect to the overseas school program for minor dependents of government personnel. The authority for operating such schools was contained in various appropriation bills for the Department of Defense and its various agencies. The bills authorized funds to be expended for these purposes when the Secretary of the Department concerned found that schools, if any, available in any given locality were unable to provide adequately for the education of such dependents.[1] Also, in each of these appropriation bills, as well as those enacted during the years involved here, Congress placed an express limitation ceiling on the amount of the funds appropriated which could be used for the education of such dependents. This limitation was provided in the form of specific average amounts per pupil (hereinafter referred to as the "per pupil limitation"). For example, the following provision in the Act of October 17, 1963, was typical of similar statements in all of the relevant appropriation acts:
 
 
 5
 Sec. 506. Appropriations for the Department of Defense for the current fiscal year shall be available * * * for primary and secondary schooling for minor dependents of military and civilian personnel of the Department of Defense residing on military or naval installations or stationed in foreign countries, * * * in amounts not exceeding an average of $285 per student, when the Secretary of the Department concerned finds that schools, if any, available in the locality, are unable to provide adequately for the education of such dependents * * *. [77 Stat. 264, § 506 (1963).][2] [Emphasis supplied.]
 
 
 6
 The Congress was informed at all times relevant to this case of the costs charged to appropriated funds and to the per pupil limitation in the overseas schools. Generally, such chargeable costs included salaries of superintendents and other professional and non-professional personnel engaged in the general administration of the schools, including secretarial and clerical assistants, office and miscellaneous school supplies, basic salaries and wages of principals, supervisors, consultants, teachers, and librarians. Also included in such costs were instructional material such as textbooks, replacement of library books, and instructional supplies.
 
 
 7
 There were other costs which were chargeable to appropriated funds but were not chargeable to the per pupil limitation which were generally as follows:
 
 1. Salaries and wages:
 
 8
 a. Command Staffs and Other Support Personnel.
 
 
 9
 b. Drivers.
 
 
 10
 c. Custodial Services.
 
 
 11
 2. Utilities and Services.
 
 
 12
 3. Rental.
 
 
 13
 4. Travel, Overseas Allowances, Government Contributions.
 
 
 14
 5. Equipment (Replacement).
 
 
 15
 6. Supplies.
 
 7. Transportation.[3]
 
 16
 The per pupil limitation was arrived at each year by dividing the average daily membership of each of the schools into the sum of the total obligations and costs mentioned above which were chargeable to appropriated funds and to the per pupil limitation.
 
 
 17
 The Department of Defense has operated the overseas schools since World War II and up to and including the years involved in these cases under these appropriation acts of the Congress which expressly limited the expenditure of funds for the education of minor dependents of overseas personnel on a per pupil limitation basis as set forth in the appropriation acts.
 
 
 18
 The plaintiffs were recruited by the Department of Defense beginning in 1959, to teach in its overseas schools under the system then prevailing as indicated above. Prior to 1960, the plaintiffs were employed as teachers at the grade of GS-7 under the Classification Act of 1949, 5 U.S.C. §§ 1071-1151 (1964). Each of the plaintiffs were employed for a school year and his or her rate of pay was computed on the basis of the annual rate provided by the applicable schedule of the classification act, but only for the school year period for which they were employed. The computation procedure set up for this purpose is listed in Section 944 of the Federal Employees Pay Act of 1945, 5 U.S.C. §§ 901-948 (1964). There was a great deal of dissatisfaction among the teachers under this system because they were only paid for nine or ten-twelfths of the year since they did not work the entire year. This required them to be placed on a nonpay status during recess periods such as Thanksgiving, Christmas, Easter, and during the summer vacations. These problems, among others, caused the Congress to enact Public Law 86-91 which removed all teachers, including the plaintiffs, from the Classification Act of 1949, supra, the Federal Employees Pay Act of 1945, supra, and the Annual and Sick Leave Act of 1951, 5 U.S.C. §§ 2061-2071 (1964), and provided a new system for the appointment of teachers, conditions of employment, rates of basic compensation, length of school years, quarters allowances, and various other entitlements. It became law on July 17, 1959. The pertinent parts of Public Law 86-91 are as follows:
 
 
 19
 § 2352. Regulations of Secretary of Defense
 
 
 20
 (a) Not later than the ninetieth day following July 17, 1959, the Secretary of Defense shall prescribe and issue regulations to carry out the purposes of this chapter. Such regulations shall govern —
 
 
 21
 (1) the establishment of teaching positions;
 
 
 22
 (2) the fixing of the rates of basic compensation for teaching positions in relation to the rates of basic compensation for similar positions in the United States;
 
 
 23
 (3) the entitlement of teachers to compensation;
 
 
 24
 (4) the payment of compensation to teachers;
 
 
 25
 (5) the appointment of teachers;
 
 
 26
 (6) the conditions of employment of teachers;
 
 
 27
 (7) the length of the school year or school years applicable to teaching positions;
 
 
 28
 (8) the leave system for teachers;
 
 
 29
 (9) quarters, allowances, and additional compensation for teachers; and
 
 
 30
 (10) such other matters as may be relevant and appropriate to the purposes of this chapter.
 
 
 31
 * * * * * *
 
 
 32
 § 2353. Administration
 
 
 33
 (a) Employment and salary practices.
 
 
 34
 The secretary of each military department in the Department of Defense shall conduct the employment and salary practices applicable to teachers and teaching positions in his military department in accordance with this chapter, * * *.
 
 
 35
 (b) * * * the secretary of each military department —
 
 
 36
 * * * * * *
 
 
 37
 (2) shall establish the appropriate annual salary rate in accordance with this chapter for each such position and individual to which * * * determined to be applicable.
 
 
 38
 (c) Rates of basic compensation
 
 
 39
 The Secretary of each military department shall fix the rates of basic compensation of teachers and teaching positions in his military department in relation to the rates of basic compensation for similar positions in the United States but no such rate of basic compensation so fixed shall exceed the highest rate of basic compensation for similar positions of a comparable level of duties and responsibilities under the municipal government of the District of Columbia.
 
 
 40
 As previously set out, Section 2352 of Public Law 86-91 required the Secretary of Defense to prescribe and issue regulations to carry out the purposes of the Act. In order to issue such regulations, a series of meetings was arranged between the Department of Defense and the Overseas Education Association and the National Education Association which resulted in the promulgation of what was known as "Salary Determination Procedures, Overseas Dependents School Teaching Positions Class I." These procedures provided for an annual review of the compensation schedules with a comparison to be made with rates of compensation in urban school jurisdictions of 100,000 population and over. This was because most of the teachers were recruited from urban areas with a population of 100,000 or more. The procedures thus established were keyed to the per pupil limitation established by Congress. For instance, it was provided that:
 
 
 41
 3. Salary data for teaching positions will be obtained and analyzed on a timely basis and the results will be utilized to seek adjustment in the per pupil limitation sufficient to permit warranted increases in the compensation schedule.
 
 
 42
 Comment: It must be recognized that the per pupil limitation established by the Congress determines the maximum amount which can be spent in the operations of the dependents schools. Since salaries comprise a substantial part of operating costs it is expected that in the future the per pupil limitation will have to be increased before salaries can be adjusted. The most appropriate time to start administrative action to obtain an increase in the per pupil limitation is in August of each year, the time at which final budget preparation for the following fiscal year commences. This means that determination as to warranted salary adjustments must be made in July of each year.
 
 
 43
 * * * * * *
 
 
 44
 5. When the per pupil limitation is known, final determination as to an appropriate adjustment will be made. Adjustments in the compensation schedule will be made coincident with the beginning of a school year.
 
 
 45
 Comment 1: It is planned that if the per pupil limitation is increased sufficiently to effect adjustments as provided above, such adjustments will be ordered into effect. There may be times, however, where the per pupil limitation will permit only part of the adjustment being made effective. Final determination of the adjustment, therefore, should await decision on the per pupil limitation. [Emphasis in original.] [Salary Determination Procedures, Overseas Dependents School Teaching Positions Class I, Department of Defense, August 31, 1960.]
 
 
 46
 Pursuant to these salary determination procedures, compensation was adjusted upward for the year 1960, from $150 to $185 per step so as to approximate the average increment to be in effect in school jurisdictions in the United States with a population of at least 100,000.
 
 
 47
 Each year subsequent to 1960, the Department of Defense requested that the Congress increase the per pupil limitation so that salaries of teachers might likewise be increased. The Congress was thus apprised that the salaries of teachers were directly connected with the per pupil limitation. It appears that the Congress, in fixing the per pupil limitation for each of the years involved, considered not only the salaries paid to the teachers, but also fringe benefits available to them overseas that were not enjoyed by teachers holding similar positions in the United States.
 
 
 48
 In 1961, a $10 increase was requested by the Department of Defense of Congress so that a $200 increase in salary might be made for teachers, but the request was denied. For the school year 1962-63, $10 was requested so that salaries might be raised $190, but only $5 was granted and the contemplated raise was not given. For the school year 1963-64, $5 was requested and granted and accordingly the $100 raise was given to teachers as planned. However, for the school year 1964-65, a $10 increase was requested so that teachers salaries might be raised $200, but it was denied and the raise was not possible. For school year 1965-66, the entire per pupil limitation system was changed to include all costs of the overseas schools including $11 to allow an increase of $300 in the salaries of the teachers. The request of $445 per pupil was granted and the $300 raise was given to the teachers. In 1966, Public Law 86-91 was amended so as to provide that salaries for overseas teachers would be equal to the salaries of teachers in comparable positions in school districts in the United States having a population of 100,000 or more.[4] This law became effective on the first day of the first pay period after the enactment of the Act and accordingly was placed into effect by the Department of Defense promptly after April 14, 1966. Consequently, there has been no problem with respect to overseas teachers' salaries since the passage of the amendment in 1966.
 
 
 49
 The plaintiffs allege that they were not paid salaries as overseas teachers in accordance with the provisions of this Act. They have filed these suits to be recompensed for the difference between what was actually paid to them and the amount which they claim is owed to them pursuant to Public Law 86-91. It is undisputed that all of the plaintiffs were paid the salaries which they were promised at the time they were recruited.
 
 
 50
 More particularly, the plaintiffs contend that Public Law 86-91 required the secretary of each military department to fix the salaries of teachers in his department so that they would be equal to the salaries paid to teachers in similar positions in schools located in the District of Columbia.[5]
 
 
 51
 They offer the alternative argument that the Congress fixed their salaries by Public Law 86-91 at rates equal to those paid teachers in similar positions in schools located in the United States, but not to exceed the highest salaries for comparable positions in the District of Columbia.
 
 
 52
 In either event, their position is quite clear — that since the standard set out is one of equality, their salaries must be continuously readjusted to reflect fluctuations in salaries paid to teachers occupying similar positions in the United States.
 
 
 53
 They claim that the Secretary of Defense had no discretion except to pay the salaries as fixed by the Congress in the Act, and that continuing readjustment was mandatory without regard to the per pupil limitation contained in the appropriation acts of the Congress during the years that are relevant here.
 
 
 54
 The defendant responds with two contentions either of which, it asserts, bars recovery. First, that the Act in no way requires continuing readjustments in salary rates absent prior congressional approval and in fact there were no funds to pay the salaries now claimed. Second, assuming arguendo, that the Congress had established a specific mandatory statutory rate, the fixing of annual expenditure ceilings via the per pupil limitation resulted in an implied repeal of any obligation Public Law 86-91 is said to have created.
 
 
 55
 Plaintiffs naturally take the position that there was no implied repeal and allege that during each of the years involved in this case there was a balance of unobligated funds remaining on hand for the Department of Defense in a sufficient amount to have paid the plaintiffs the salaries which they claim they were entitled to under Public Law 86-91. Further, assuming for the sake of argument that there was a failure or exhaustion of appropriation, plaintiffs argue that this would not affect their right to secure the additional earnings.
 
 
 56
 Finally, the plaintiffs in No. 83-65, press a separate claim for the first time in their motion for summary judgment. They urge that they are entitled to additional compensation for their services prior to the effective date of Public Law 86-91 when the Classification Act of 1949, supra, was applicable to them. The claim embraces compensation for the various periods during which they were placed on a leave without pay status.
 
 
 57
 Once unravelled, the present conflict almost wholly involves the proper interpretation to be placed upon Public Law 86-91.
 
 
 58
 In the first place, the plaintiffs have construed the words "in relation to" in Section 2353(c) of the Act to mean "equal to" salaries of teachers occupying comparable positions in schools located in the District of Columbia. In order to resolve this matter of interpretation of the Act, we must look to the statute itself.
 
 
 59
 While we recognize that courts can go beyond the language contained in a statute to ascertain its meaning, they should be careful in departing from the statutory terms. To the extent possible, violence should not ordinarily be done to the words chosen by the Congress. Flora v. United States, 357 U.S. 63, 65, 78 S. Ct. 1079, 2 L.Ed.2d 1165 (1958), aff'd on rehearing, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960); Thermo King Corp. v. United States, 354 F.2d 242, 246, 173 Ct.Cl. 860, 868 (1965).
 
 
 60
 To accept the plaintiffs' contention that the salaries were to be equal to those in the District of Columbia, would accord little, if any, significance to the prohibition against fixing salaries in excess of those paid to District of Columbia teachers. Moreover, the standard, plainly set out in the statute, of comparing the overseas rates of basic compensation with those prevailing in the United States for comparable positions would be rendered meaningless.
 
 
 61
 It is a cardinal principle of statutory construction to give effect to every clause, sentence and word of a statute, if possible, rather than to distort the language so as to defeat the plain intent of the Congress. United States v. Menasche, 348 U.S. 528, 538-539, 75 S.Ct. 513, 99 L.Ed. 615 (1955); United States v. Alpers, 338 U.S. 680, 681-682, 70 S.Ct. 352, 94 L.Ed. 457 (1950); Johnston v. United States, 163 Ct.Cl. 375, 380 (1963); Drier v. United States, 70 F.Supp. 888, 892, 108 Ct.Cl. 487, 494 (1947). When this is done with respect to Public Law 86-91, it is clear that it nowhere fixes the salaries of overseas teachers equal to the salaries of teachers occupying comparable positions in the District of Columbia. To place such a construction upon the Act, we would be required to read into it words which are not there. We therefore reject the plaintiffs' first contention.
 
 
 62
 Secondly, we must examine whether the Act required rates of basic compensation to be equal to those paid teachers in similar positions in schools located throughout the United States.
 
 
 63
 Aside from the fact that such an interpretation of the Act would prove unworkable under the plaintiffs' theory that the secretary was not clothed with discretion to fix salaries, plaintiffs face and cannot overcome the same obstacles which caused us to discard their first argument — that is — their view reads words into the Act and leaves words and sentences contained therein without purpose.[6]
 
 
 64
 It is also clear that the Congress merely set the boundaries of the program allowing the Secretary of Defense to fill in the details. Nowhere did Congress fix salaries in Public Law 86-91, nor did it define the positions which were to be looked to in the United States as similar to those occupied by the overseas teachers.
 
 
 65
 That the Secretary was vested with discretion to issue regulations governing the fixing of rates of basic compensation follows unmistakably from the grant of authority contained in Section 2352(a) (2) of the Act.
 
 
 66
 Also relevant in this vein is the fact that there was no line item for teachers' salaries or for any other specific expense of the overseas schools in any of the appropriation acts of the Congress. The funds for such schools were appropriated in a lump sum subject to the per pupil limitation and the Department of Defense was authorized to disburse the funds for the various costs and expenses of the schools within the per pupil limitation contained in each appropriation act. Plaintiffs' recognition that no portion of the appropriated funds were earmarked points up all the more the administrative discretion in discerning relative needs and priorities.
 
 
 67
 While the issue of executive discretion has been determined by the foregoing analysis, it is pertinent to note that some of the plaintiffs in No. 267-65, were denied a writ of mandamus to compel the Secretary of Defense to grant pay raises under Public Law 86-91. Mitchell v. McNamara, 122 U.S.App.D.C. 224, 352 F.2d 700 (1965). It was said that:
 
 
 68
 * * * courts will not interfere with the exercise of executive discretion in situations as confused and difficult as the present. [Supra at 701.]
 
 
 69
 This is persuasive authority for the position we take today. See United States v. Shimer, 367 U.S. 374, 381-382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961); Fix v. United States, Ct.Cl., 368 F.2d 609, 614, decided November 10, 1966.
 
 
 70
 Having decided that a standard of equality was not prescribed by the Congress and, furthermore, that the Secretary of Defense was clothed with discretionary powers, we turn our attention to the regulations promulgated by him under the Act and an ascertainment of whether plaintiffs' salaries were to be continuously adjusted in accordance with increments given to teachers serving in similar positions in the United States as defined in the regulations, independent of the appropriation authorized.
 
 
 71
 Although resolution of this issue is not assisted by the most careful reading of the statute, a thorough search of the legislative history of Public Law 86-91 and its attendant circumstances leads to the conclusion that the plaintiffs' position cannot be sustained.
 
 
 72
 During the hearings on Public Law 86-91, it was estimated that the proposed legislation would cost only an additional $270,000 per year and that this was due to the fact that an increment was planned for teachers with higher qualifications. This view was concurred in by the teachers' representative, Miss Mary Hoague, who also rejected the thought that the legislation was to be a pay raise measure. Hearings on H.R. 1871 and related bills Before the Subcommittee of the House Committee on Post Office and Civil Service, 86th Cong., 1st Sess. 17, 37, 41-2 (1959).
 
 
 73
 These considerations were accepted by the Congress as illustrated by the following excerpt from H.R. REP. No. 357, 86th Cong., 1st Sess. 3 (1959), U.S.Code Cong. & Admin. News 1959, p. 1783:
 
 
 74
 * * * * * *
 
 COST
 
 75
 The Department of Defense estimates that enactment of this legislation will result in increased costs in the approximate amount of $270,000 per annum for operation of the dependents schools in oversea areas. The major part of this additional cost will be incurred by reason of additional compensation allowed certain teachers in recognition of advanced degrees and teaching experience.
 
 
 76
 * * * * * *
 
 
 77
 Had Congress sought to disclose an intent to create a mandate for continuing automatic pay adjustments divorced from legislative control, it certainly would not have limited its consideration to increments concerned solely with higher qualifications.
 
 
 78
 In addition, it will be recalled that the Secretary of Defense issued regulations after consultation with representatives of the Overseas Education Association and the National Education Association calling for an annual salary review with a comparison to be made with rates of compensation in urban school jurisdictions of 100,000 population and over. Furthermore, as previously indicated, these procedures were explicitly made subject to the per pupil limitation and transmitted to the interested parties.[7]
 
 
 79
 That the various education associations were advised of the effect of the per pupil limitation contained in the various appropriation acts is amply demonstrated by the following statements they made before the Senate:
 
 
 80
 Last August our Overseas Education Association, the National Education Association and the Department of Defense agreed upon the "Department of Defense Salary Determination Procedures," which provides for an annual review and adjustment of overseas teachers' salaries in conformity to the average of stateside districts having 100,000 or more in population. We value this decision highly, and at the same time recognize that the adjustment of our salaries is dependent upon the per pupil money allotment voted by the Congress. [Hearings on H.R. 7851 Before the Subcommittee of the Senate Committee on Appropriations, 87th Cong., 1st Sess. 1054 (1962).]
 
 Also, it was stated in even a later year:
 
 81
 This unhealthy salary situation, recognized by DOD's own report, is the direct result of a per-pupil limitation. The limitation limits salaries. It limits the amount of money which may be spent for textbooks, library books, and tuitions, but since most of the money appropriated goes into salaries, it is salaries which are in turn most limited. [Hearings on H.R. 7179 Before the Subcommittee of the Senate Committee on Appropriations, 88th Cong., 1st Sess. 1456 (1964).]
 
 
 82
 At this juncture we have the situation where there was not even the slightest suggestion or intimation by the Congress that Public Law 86-91 required constant adjustment of teachers' salaries, where the Secretary of Defense implemented the statute under specific monetary ceilings, and where the persons affected were mindful of this interpretation and, at least, to some extent acquiesced in it.
 
 
 83
 These circumstances call for application of the rule that administrative practice consistent and generally unchallenged "has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 512 (1933). Accord, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), rehearing denied, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); Power Reactor Development Co. v. International Union of Electrical Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). See Iran Nat'l Airlines Corp. v. United States, 175 Ct.Cl. 504, ___, 360 F.2d 640, 643 (1966); H. B. Zachry Co. v. United States, 344 F.2d 352, 358-359, 170 Ct.Cl. 115, 125 (1965); Schellfeffer v. United States, 343 F.2d 936, 942, 170 Ct.Cl. 178, 187 (1965). We accept this administrative interpretation as correct.
 
 
 84
 Fortifying this result even further is the fact that at hearings on appropriations for the overseas school program for the years in question, the Congress was continually made aware of the interpretation placed upon the Act by the Secretary of Defense.[8] This supports "the natural presumption that Congress, in its subsequent actions, accepted them as legitimate interpretations." Allen v. Grand Central Aircraft Co., 347 U.S. 535, 544-545, 74 S.Ct. 745, 751, 98 L.Ed. 933 (1954); Power Reactor Development Co., supra, 367 U.S. at 408-409, 81 S.Ct. 1529. See Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 319, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958).
 
 
 85
 This legislative history of Public Law 86-91 supports and adds emphasis to the conclusions we have already reached that the Act did not fix the salaries of overseas teachers equal to those in comparable positions in the District of Columbia or throughout the United States. Furthermore, it shows unmistakably that such salaries were keyed to the per pupil limitation contained in the appropriation acts of the Congress and were to be fixed within such limitation in the discretion of the Secretary of Defense.
 
 
 86
 The plaintiffs fashion the argument, however, that since the 1966 amendment to Public Law 86-91 provides that salaries for overseas teachers would be equal to the salaries of teachers in comparable positions in school districts in the United States having a population of 100,000 or more, this is a positive expression of the intent that Congress had in enacting the original legislation in 1959.
 
 
 87
 While undoubtedly both the plaintiffs and defendant could select choice bits of legislative history to support their views as to the effect of the 1966 amendment, we are of the opinion that it is hazardous business to resort to that legislative history in ascertaining the intent underlying the passage of Public Law 86-91. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 348-349, 83 S.Ct. 1715, 10 L.Ed. 2d 915 (1963) and cases collected therein.
 
 
 88
 Moreover, it is arguable that Congress, as shown by its continued acquiescence, accepted the interpretation of the Department of Defense and recognized the need for the 1966 amendment if a different result was desired.
 
 
 89
 Plaintiffs, however, place great emphasis on the assertion that the Department of Defense had unobligated funds from which these salary claims could have been paid.
 
 
 90
 Since we have recognized that increments to teachers salaries were limited by the congressional appropriations as set forth each year in the per pupil limitation, suffice it to say that the Department of Defense would have no authority to expend funds except for the purposes for which an appropriation was made. See Norcross v. United States, 142 Ct.Cl. 763 (1958); Norcross v. United States, 142 Ct.Cl. 767 (1958); Lovett v. United States, 66 F.Supp. 142, 104 Ct. Cl. 557 (1945), aff'd on other grounds, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); Maiatico v. United States, 112 U.S.App.D.C. 295, 302 F.2d 880 (1962); 21 Ops. Att'y Gen. 414, 415 (1896); 34 Ops. Comp. Gen. 599, 600 (1955).
 
 
 91
 Since it is uncontroverted that there were no funds remaining within the confines of the per pupil limitation with which the salaries claimed could have been satisfied and that no abuse of discretion has been shown in the disbursement of those funds by the agency, we conclude that the plaintiffs have shown no basis for recovery under Public Law 86-91. See United States v. Shimer, supra.
 
 
 92
 In view of our disposition of the case thus far, it is unnecessary to consider the other issues raised by the parties concerning Public Law 86-91.
 
 
 93
 The determination of one further issue, however, is necessary to a complete disposition of this case. That is the claim based upon the Classification Act of 1949, supra.
 
 
 94
 Inasmuch as this claim was not pleaded in the petition in No. 83-65, filed on March 18, 1965, nor was an amendment sought as provided in our Rule 22, it is not properly before the court at this time and cannot be considered.
 
 
 95
 Accordingly, defendant's cross motion for summary judgment is granted, plaintiffs' motions for summary judgment are denied, and plaintiffs' petitions are dismissed.
 
 
 
 Notes:
 
 
 *
 By order of the court of December 12, 1966, No. 407-66, Edna T. Ackal, et al., v. The United States, was consolidated with Nos. 83-65, 93-65, 267-65, 449-65, 159-66, and 212-66
 
 
 [1]
 For example, see the Act of July 10, 1952, 66 Stat. 533, § 616 (1952)
 
 
 [2]
 The various appropriations acts for 1953 to 1966, inclusive, showing the per pupil limitation for the overseas schools are as follows:
 Fiscal Appropriation Act Per pupil
 Year citation limitation

 1953 _________ 66 Stat. 533 § 616 (1952) ___________________ $225
 1954 _________ 67 Stat. 351 § 614 (1953) ___________________ 225
 1955 _________ 68 Stat. 351, § 709 (1954) __________________ 235
 1956 _________ 69 Stat. 315 § 609 (1955) ___________________ 240
 1957 _________ 70 Stat. 468 § 607 (1956) ___________________ 245
 1958 _________ 71 Stat. 323-324 § 607 (1957) _______________ 245
 1959 _________ 72 Stat. 724, 867 § 606 (1958) _______________ 245-265
 1960 _________ 73 Stat. 378-379 § 606 (1959) _______________ 265
 1961 _________ 74 Stat. 350 § 506 (1960) ___________________ 275
 1962 _________ 75 Stat. 375-376 § 606 (1961) _______________ 275
 1963 _________ 76 Stat. 328 § 506 (1962) ___________________ 280
 1964 _________ 77 Stat. 264 § 506 (1963) ___________________ 285
 1965 _________ 78 Stat. 475 § 506 (1964) ___________________ 285
 1966 _________ 79 Stat. 873-874 § 606 (1965) _______________ 455
 
 
 [3]
 Department of Defense Instruction No. 1342.5, pp. 6-8, April 10, 1964
 
 
 [4]
 Public Law 89-391, effective April 14, 1966, provided as follows:
 "5 U.S.C. § 2352(a) (2) is amended to read as follows:
 "(2) the fixing of basic compensation for teachers and teaching positions at rates equal to the average of the range of rates of basic compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population;".
 "* * * 5 U.S.C. § 2353(c) is amended to read as follows:
 "(c) The Secretary of each military department shall fix the basic compensation for teachers and teaching positions in his military department at rates equal to the average of the range of rates of basic compensation for similar positions of a comparable level of duties and responsibilities in urban school jurisdictions in the United States of 100,000 or more population.".
 
 
 [5]
 Plaintiff, in No. 93-65, contends that he should have been paid a salary equal to the salaries paid to teachers occupying similar positions in Puerto Rico and Panama
 
 
 [6]
 The legislative history referred to by the plaintiffs in their brief does not support their positions. The strongest language contained in the hearings and committee reports do no more than reflect the language contained in the Act itself. See Hearings on H.R. 1871 and related bills Before the Subcommittee of the House Committee on Post Office and Civil Service, 86th Cong., 1st Sess. 5-7, 24 (1959); H.R. REP. No. 357, 86th Cong., 1st Sess. 4-5 (1959), U.S.Code Cong. & Admin. News 1959, p. 1783
 
 
 [7]
 Other regulations promulgated by the Secretary of Defense also made reference to the per pupil limitation. See Department of Defense Instruction No. 1342.5, October 28, 1957; Department of Defense Instruction No. 1342.5, April 10, 1964. (The latter instruction cancelled the instruction dated October 28, 1957.)
 
 
 [8]
 The plaintiff seeks to make much of the fact that the Department of Defense never sought supplemental appropriations to meet the salary demands of the plaintiffs. It is a fact, however, that the Department of Defense requested an increase in the per pupil limitation for every fiscal year bearing upon the subject matter in these suits so that teachers' salaries could be raised. See Hearings on H.R. 11998 Before the Subcommittee of the Senate Committee on Appropriations, 86th Cong., 2d Sess., pt. 2, 1415 (1961); Hearings Before the Subcommittee of the House Committee on Appropriations, 87th Cong., 1st Sess., pt. 6, 138-39 (1962); Hearings on H.R. 7851 Before the Subcommittee of the Senate Committee on Appropriations, 87th Cong., 1st Sess. 1143 (1962); Hearings Before the Subcommittee of the House Committee on Appropriations, 87th Cong., 2d Sess., pt. 3, pp. 718-22, pt. 6, p. 77 (1963); Hearings on H.R. 11289 Before the Subcommittee of the Senate Committee on Appropriations, 87th Cong., 2d Sess. 719-20 (1963); Hearings Before the Subcommittee of the House Committee on Appropriations, 88th Cong., 1st Sess., pt. 4, 49, 982, 998-99 (1964); Hearings on H.R. 7179 Before the Subcommittee of the Senate Committee on Appropriations, 88th Cong., 1st Sess. 213 (1964); Hearings Before the Subcommittee of the House Committee on Appropriations, 88th Cong., 2d Sess., pt. 2, 633-50 (1965); Hearings on H.R. 10939 Before the Subcommittee of the Senate Committee on Appropriations, 88th Cong., 2d Sess., pt. 2, 532-34, 764-66 (1965); Hearings Before the Subcommittee of the House committee on Appropriations, 89th Cong., 1st Sess., pt. 5, 580-602, 681-722 (1966); Hearings on H.R. 9221 Before the Subcommittee of the Senate Committee on Appropriations, 89th Cong., 1st Sess., pt. 2, 554-55 (1966)
 
 
 
 96
 NICHOLS, Judge (dissenting).
 
 
 97
 With all respect, I am unable to agree with the decision of the majority in this case.
 
 
 98
 I start with the language of the controlling statute, 5 U.S.C. 2353(c), which at pertinent times (July 1959 to the institution of this action in March 1965) read as follows:
 
 
 99
 
 Rates of Basic Compensation.
 
 
 
 100
 The Secretary of each military department shall fix the rates of basic compensation of teachers and teaching positions in his military department in relation to the rates of basic compensation for similar positions in the United States but no such rate of basic compensation so fixed shall exceed the highest rate of basic compensation for similar positions of a comparable level of duties and responsibilities under the municipal government of the District of Columbia.
 
 
 101
 Before going into the complications arising from events subsequent to enactment, it is well to consider what this means, taken on its face alone. Plaintiff says "in relation to" means "equal to" which of course would make interpretation easy. Webster's Unabridged Dictionary (1953 ed.) says that in the phrase "in relation to" the word "relation" means "reference" or "respect." I think a fair interpretation is that the Secretary is to "refer" to stateside salaries in the sense that a mariner might "refer" to a chart. The chart does not tell the mariner where to go but it tells him how to find his destination and the location of shoals he is to avoid. He would be guilty of misconduct if he ignored what the chart told him. I think the Secretary was to ascertain stateside salaries and, in light of his findings, was to fix compensation that was at least comparable. Otherwise why refer to them? He was clearly not to ignore stateside salaries and fix basic compensation out of all "relation" to them, which I find to be what he did, as is admitted in defendant's statement, paragraph 16(a). This appears to be a typical case of a proper delegation of legislative authority, with guidelines. J. W. Hampton Jr. & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928) (authority to raise customs duties to "equalize" cost of production). Delegation of uncontrolled discretion, or discretion without guidelines would be of doubtful constitutionality and we are not to presume the Congress intended it. Cochnower v. United States, 248 U.S. 405, 39 S.Ct. 137, 63 L.Ed. 328 (1919).
 
 
 102
 The defendant knows what "in relation to" means, whether or not the court does. It says (original brief, p. 28):
 
 
 103
 Thus, from the date that the salary provisions of Public Law 86-91 were implemented, in January of 1960, throughout the school year ending in June of 1961, teachers were compensated pursuant to a pay schedule fixed by the Department of Defense in relation to school districts in the United States having a population of 100,000 or more. * * * (Emphasis supplied.)
 
 
 104
 It makes no such claim for any later year in this litigation. Evidently, to it, the statutory language set a clear and specific guideline which it conformed to up to June 1961, and not afterwards. At page 31 of the original brief it says:
 
 
 105
 Thus, for the school year 1961-1962 the rates paid were admittedly lower than those which would have been paid had the rates been adjusted to conform to the average of districts * * *.
 
 
 106
 And so it went.
 
 
 107
 Assume then, the Secretary had not the apparently impossible task of determining an exactly "equal" compensation, but of finding one that was "in relation," he could have exercised his authority validly to select any figure within a range. If budgetary considerations had led him to prefer the lower side of the range, his choice would not have been subject to challenge in court. But here he made a two step determination. In every year after 1961, he selected a figure that he found was "in relation," and then afterwards he cut it substantially to meet his budget exigencies. This procedure seems to me in a manner to say to the teachers involved, to the Congress, and to this court, that the final figures were not "in relation" and were out of "relation" to the statutory guidelines, by amounts furnished to the Congressional Committees.
 
 
 108
 It is conceded, as it must be, that he could not cut a statutory salary to avoid incurring a budget deficiency, or at least, if he did, the difference would be recoverable in this court. United States v. Langston, 118 U.S. 389, 6 S.Ct. 1185, 30 L.Ed. 164 (1886). See the long line of cases cited, Lovett v. United States, 66 F.Supp. 142, 146, 104 Ct.Cl. 557, 582 (1945), aff'd on other grounds, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946).
 
 
 109
 Defendant repeatedly states the proponents of the bill denied it would raise wages. This was apparently true under any interpretation for the immediate future, and for the years that were then more remote, of course no one could have said what would occur. Defendant also says the law did not create a "mandate for continuing automatic pay adjustments." It apparently does not mean, as one might at first think, that the statute froze wages at their then rates. The Secretary did in fact adjust them annually. What the court might do if he had made no determinations but had elected to leave existing scales in effect is not before us and we need not consider what, in that event, plaintiffs' remedies would have been.
 
 
 110
 If, for fear of a budget deficiency, the salary is set below the range the guidelines permit, the situation is the same as if a fixed salary were cut. If the Secretary had not made his determination, within the guidelines, and then cut it, there might be some question as to the measure of damages, but here he has solved that problem for us, at least sufficiently for the purposes of a dissenting opinion.
 
 
 111
 Now, I turn to the subsequent events that are supposed to make a difference. It appears that when 5 U.S.C. § 2353(c) became law, as for some time before, the Congress had been accustomed to prescribe in the annual Department of Defense appropriation a per pupil limitation (hereinafter, as in the briefs, PPL) which limited the availability of funds for overseas dependent's schools, including teacher's salaries and certain overhead items in Government schools, and charges in tuition-fee schools not operated by the Department of Defense, to a stated amount per pupil. Soon upon the enactment of 5 U.S.C. § 2353(c) the Department took the position that if the PPL came into any conflict with the new standard, it would prevail, that is, statutory salaries would have to be cut to meet the PPL. In presenting its annual appropriation requests, the Department made it clear to the Appropriations Committees that the PPL would have to be lifted if the statutory standard were to be met, and by implication, that it was being treated as controlling pro tanto the statutory provision. Nevertheless, the PPL was not raised, or not enough. The Department came to fix the salaries tentatively only, and then to cut them when the appropriation bill was law and the PPL therefore known.
 
 
 112
 Are the PPL provisions to be treated as amending annually the provisions of 5 U.S.C. § 2353(c)? The answer seems clearly no. Normally, limitations in appropriations do not "reach to this court." Lovett v. United States, supra. On their faces, moreover, they could stand together and both be given effect. The teachers apparently could have been allowed their statutory pay and the PPL also observed, by increasing the size of classes, cutting overhead, or otherwise. The only time the Appropriations Committees mentioned the apparent conflict, it said in substance that the PPL could be observed and teachers be given their justified increases if certain economies were effected. House Report 1607, 87th Cong., 2d Sess. It may well be that as a practical matter, the full salaries could not be paid within the PPL's, but this depended on information the Congress may not have accepted as true. A statute is not readily to be taken as repealing by implication another which it does not designate expressly for repeal. United States v. Langston, supra. Defendant also refers to the Anti-Deficiency Act, 31 U.S.C. § 665, but this would not be binding on this court, whose judgments are separately funded.
 
 
 113
 If the Congress adverted to the possibility that the PPL's were construed as denying the teachers their legal rights, it may have intended that they be tested in this court.
 
 
 114
 Nor are these subsequent proceedings to be treated as subsequent legislative history bearing on the interpretation of 5 U.S.C. § 2353(c). We would have to find the statute ambiguous, which in my view it hardly is. A declaration by the Congress itself what a former Congress meant would not be more than persuasive, depending on circumstances. Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). That declaration not only did the Congress not give, but the Appropriations Committees did not. It was very careful to leave the statutory construction here involved to stand on the authority of the Department of Defense alone. Indeed, to have complained that the Department of Defense was being too careful with appropriated funds would, for an appropriations committee, have been a case of man biting dog. The Congress must know of a statutory construction before it can ratify it. We are not always obliged to suppose a Congress knows what a committee has been told, especially when, as here, the committee is not the one that reported the statute to be interpreted. When the Committees on Civil Service of the House and Senate learned of the interpretation here involved, they repudiated it emphatically. In Rep.No.951, 89th Cong., 2d Sess., U.S.Code Cong. & Admin.News 1966, p. 2163, the Senate Committee said the law had "never been administered in the manner which Congress intended."
 
 
 115
 The strongest argument for the defendant derives, in my view, from the interpretation which the Department of Defense adopted upon enactment of the statute to be construed. Undoubtedly, in view of their sponsorship of the legislation and the work with the committees they must have done, there could have been unrecorded or unpublished legislative history leading their officials to construe the legislation as they did. To me, however, such contemporaneous official interpretation is a better guide when it is uncoerced. The predicament an official of the executive branch is placed in, when in a squeeze between law and appropriation limitations, is something we should regard with realism, if with sympathy too. To keep his program going, which he may well regard as his primary duty, he may adopt an interpretation of law which under other circumstances he would consider untenable. Of course, the issue was academic as long as the PPL did not force the teachers' pay out of "relation." When it did, the Department might well have feared that to insist on the statutory pay levels would throw the overseas dependent's schools into chaos. To insist on the teachers' statutory rights might have denied another right, and denied it beyond all reparation by the courts; the right of those who serve their country overseas to have their children educated as they would be at home. The facts, of course, do not establish that the interpretation here involved was made under duress, but there seems to me a substantial possibility that it was. Actual inquiry as to this would be difficult and perhaps unwholesome, but I would apply with hesitation the whole concept of a contemporaneous administrative interpretation when the interpretation at issue appears to have been necessary for budgetary reasons or might have been supposed to be so necessary.
 
 
 116
 In Schellfeffer v. United States, 343 F.2d 936, 170 Ct.Cl. 178 (1965), this court took the view that it would hesitate to overturn a consistent administrative interpretation of a statute, particularly when to do so would impose on the United States a large financial burden. Sound in its then context, such a course is misapplied when the administrative interpretation involved is shown to have been itself based on budgetary considerations. It would then be tantamount to saying a debtor is exonerated from paying by his consistent and long-established opposition to paying. If the Government should benefit from such a doctrine, it would hardly have put itself in the position of a private litigant, who would probably be jailed for contempt if he interposed such a defense. The Government here was on notice that its interpretation of the statute was challenged, as it does not deny, and it continued to adhere to its position, without doing anything to clear the matter up. To my way of thinking, a long-continued administrative practice is on a different footing when it has ignored an equally long-continued challenge to its legality, and in that event it awaits the event of judicial determination without influencing it in any way.
 
 
 117
 Defendant's whole handling of this case has an odd flavor I find it hard to give a name to. They are stuck with their position. They must do their best to defend it, as they do. Yet, if plaintiffs should prevail, I cannot picture the Pentagon being draped in black. The exigencies of Government as it is practiced force the bureaucrat into successions of extravagance and meanness, and he must do many a thing his heart is not in. If an institution less august than the Department of Defense were involved, I would call its role in this litigation ignominious.
 
 
 118
 This dissent does not apply to any claim by plaintiffs for salary earned before June 30, 1961, or for any salary earned thereafter in excess of the difference between the amounts paid and the amounts determined by the Department of Defense "in relation to" certain stateside salaries, as acknowledged in its briefs and other filings.
 
 
 119
 DURFEE, Judge, joins in the foregoing dissenting opinion.