**UNITED STATES of America**

v.

**2,606.84 ACRES OF LAND IN TARRANT COUNTY, TEXAS (S. W. Richardson)**

**Civ. A. No. 2025.**

United States District Court,
N. D. Texas,
Fort Worth Division.

April 25, 1969.

Robert M. McKee, Dept. of Justice, Washington, D. C., Eldon Mahon, U. S. Atty., and Claude Brown, Asst. U. S. Atty., Fort Worth, Tex., for the Government.

Carlisle Cravens and Daniel Settle, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

BREWSTER, District Judge.

### Opinion

This suit is one of several brought in this Court to condemn lands in Tarrant and Parker Counties, Texas in connection with the Benbrook Dam and Reservoir Project on the Clear Fork of the Trinity River[1] near the southwest outskirts of Fort Worth, Texas. Only Tract B–108 in this case and one other tract in another suit remain in issue. The owner of each such remaining tract[2] is urging the same grounds in contesting the right of the government to condemn a certain portion of his subject tract. By agreement of the parties the Court has severed the issue as to the amount of just compensation from that relating to the right to condemn; and the latter issue is the only one to be decided at this time. The dam has long since been completed and closed, and the reservoir formed thereby has been in operation for a number of years.

The landowner contests the right of the government to condemn the fee simple title to the 647 acres of Tract B–108 above the 697.1 contour line[3] because the taking is unauthorized by law and is therefore arbitrary and capricious for each of the following reasons: (1) The 647 acres were actually taken for recreational use, when that was not one of the purposes for which private property could be condemned under the statutes governing this project at the time of taking. (2) The Benbrook Dam and Reservoir as actually built was radically and materially changed from the one approved by Congress, without any legal authority for such changes, resulting in the effort to condemn the present 1207 acres out of the Richardson 2500 acre tract instead of the 48 acres that would have been required for the project as authorized by Congress. He contends that the declaration of taking vested the United States with only a defeasible title to the land in question, leaving the right in him as the landowner to contest the validity of the taking in this judicial proceeding.

The landowner has never contested the right to take the fee simple title to the 560 acres below contour line 697.1, or to take a flowage easement in the portion of Tract B–108 above that line. In fact, he has offered and stood ready from the early stages to give the government the 560 acres in fee, a flowage easement in

---

1. This is the name used in the Act of Congress authorizing the project. "Benbrook", "reservoir" and "project" will be used herein at times for brevity. The reservoir resulting from the dam is called "Benbrook Lake".

2. S. W. Richardson, the owner of the subject tract (B–108) at the time this suit was filed, has died and his executors have been made parties defendant in his stead.

3. References of this kind are to the ground elevation in feet above mean sea level. 697.1 is the five year flood frequency line.

the remaining 647 acres, and a waiver of any damages due to flooding, all without cost. The government has steadfastly insisted on the fee title to the entire tract, even though it has been satisfied with flowage easements above elevation 697.1 in other lands in the area.

The government contends that the Benbrook Dam and Reservoir was a project authorized by an Act of Congress; and that since the decisions of the Secretary of the Army as to the subject tract were within the scope of such Act, they are conclusive on the question of the purpose of the taking. The government's position in that regard has not been consistent at all stages of the case. It has ebbed and flowed from conceding the right of judicial review to the present claim that it should be denied outright. In one place in its briefs,[4] it stated that, "[I]t is at least theoretically conceivable that a case of arbitrary, capricious or corrupt conduct might arise for judicial determination." That weakened to a "more or less" concession in another place where it said: "Some lower courts have, in dictum, asserted a limited power of judicial review, phrased in terms of determining whether the administrative official acted in 'bad faith' or 'arbitrarily or capriciously.' In truth, government counsel in earlier cases as here, have more or less conceded a limited exception, no doubt secure in the thought that no bad faith could be shown[5] * * *" The government now argues that a landowner in a condemnation case is helpless to question the use declared by the administrative officer making the determination, and that the courts are powerless to get at the truth and grant relief. It says that

the only remedy for an unauthorized, arbitrary or capricious condemnation of private property is political rather than judicial,[6a] and that to hold otherwise "could be alarming to any administrator." [6b]

In reply to the landowner's other contention, the government denies that the differences in the project as constructed and the one as originally authorized were substantial. It says that they were mere modifications permitted by the Act of Congress creating the project, and that they were at least impliedly authorized by subsequent appropriation acts.

The Court is of the opinion that the landowner's claims above set out are correct. The Benbrook project was authorized "for navigation, flood control, and allied purposes" by the River and Harbor Act of 1945 approved March 2, 1945 (Public Law 14—79th Congress, 59 Stat. 10). The construction, executive and administrative functions of this project have been at all pertinent times vested in the Engineer Corps, United States Army,[7] under the direction of the Secretary of the Army. As a practical matter, the Secretary had no knowledge of this project, and the Corps of Engineers made all the actual decisions from beginning to end. At the time of the taking of the subject tract, there was no authority to acquire land in connection with flood control projects for purely recreational purposes. That authority did not come until 1958. Prior to that time, lands acquired for congressionally authorized purposes in connection with these flood control projects were permitted by law to be used incidentally for recreational purposes. Act of December 22, 1944, 58 Stat. 887, 889, as amended July 24, 1946, 60 Stat. 642, 16 U.S.C.A.

4. Memorandum in Opposition to Defendant's Motion Reurging Dismissal.

5. Same memorandum as in footnote 4. One wonders where the feeling of security in this case comes from when he reads the statement of General Sturgis, Chief of Engineers, quoted shortly hereafter, about how embarrassing it would have been for the Secretary to have had to justify his

certification of the public need for this taking.

6a. Same memorandum as in footnote 4.

6b. Government's Memorandum in Support of Findings of Fact and Conclusions of Law.

7. Hereinafter referred to as Corps of Engineers.

Sec. 460d. The Corps of Engineers could not wait for legislative authority to condemn for recreational purposes. For several years prior to 1953, it followed the practice[8] of enlarging upon the amount of property it had authority to acquire for flood control and other projects, so as to take land for purely recreational purposes.[9] The use stated was always one which was authorized by Congress. The practice was general, well established and in force at the time of the taking of the land here involved, but Secretary of the Army Pace apparently first learned about it when the landowner in this case sought to take his deposition on the purpose of the taking. To stop the practice, the Department of the Army adopted the "1953 Policy for Land Acquisition". That policy limited the amount of land to be taken in fee to those areas required up to the conservation pool level, to land within 300 feet from the edge of that pool or which would be within the five year flood frequency level, to land required for permanent structures and for operation of the project as required by law, and to land required to provide limited access to the reservoir by the public. A permanent flowage easement was the greatest estate that could be acquired above the five year flood frequency line.[10] The Department of Interior joined in that policy.

The following quotation is taken from a statement made by General Sturgis in 1957 before the Subcommittee last named in footnote 9 in regard to the

8. The Chief of Engineers called this a "field practice", and said it became "so extensive as to risk successful challenge by landowners in the courts."

9. This policy was exposed in Investigation of the Corps of Engineers Civil Works Program by a Subcommittee of the Committee on Appropriations, House of Representatives, 82d Congress, First Session (1951), and in Hearings before a Subcommittee of the Committee on Government Operations, House of Representatives, Eighty-fifth Congress, First Session, on Army-Interior Reservoir Land Acquisition Policy (1957).

10. By way of example only, the following is quoted from a letter of October 19, 1953 from Robert T. Stevens, the then Secretary of the Army, to the lawyer who was representing Richardson at that time, to show the effect of the application of such policy to Tract B–108:

"Upon application of the policy to the taking of the Richardson land, it has been determined necessary to acquire fee title to approximately 560 acres lying below contour elevation 697.1. The remaining 38 acres is that land along the shore of the conservation pool which is subject to inundation at least once in each 5 years on the average. A flowage easement will be adequate in the remaining 597 acres of land lying between elevations' 697.1 and 741.0. To operate the project for flood control, it will at times be necessary to store floodwaters in the easement area provided. Consequently, it is necessary that structures for human habitation be prohibited in the easement area. It is not proposed to acquire any interest in the land above contour elevation 741. Since the land bordering the conservation pool is extensive, it will be necessary that the Government acquire a right-of-way for road purposes across the easement area in order to perform necessary operation and maintenance activities in the fee area. This right-of-way, I am sure, can be one that will be mutually agreeable.

"It is very gratifying to me that the new policy reduces the amount of land required from Mr. Richardson to 560 acres from the 1,460 acres originally recommended. In my opinion, the 560 acres, computed on the criteria of the new policy, will serve the needs of the Government and at the same time permit Mr. Richardson to retain control of 900 acres originally proposed for condemnation.

"I sincerely hope that you and Mr. Richardson will feel that I have made not only a conscientious but also a wise determination of policy in regard to real-estate acquisition. If so, I hope that the Richardson litigation may now be settled. I have no fear that the landowner's title and rights will be described so clearly that they will not be subject to some other interpretation in the future by the Corps of Engineers. I will welcome your reaction to this letter and the policy enclosed herewith."

(Hearings before a Subcommittee of the Committee on Government Operations, House of Representatives, Eighty-fifth Congress, First Session, on Army-Interior Reservoir Land Acquisition Policy, page 446.)

land acquisition practice of the Corps of Engineers before the adoption of the 1953 policy (p. 422):

"That present practices on the liberal side to help fish and wild life and recreation, could and were being challenged by individuals through the courts with consequent potential and actual embarrassment and resulting adverse publicity. For example, a former Secretary of the Army, Mr. Pace, had been called personally to appear in court to justify certain takings which, under law, he alone was responsible for determining. He managed to avoid appearing in this case until Secretary Stevens replaced him, *but it could have been very embarrassing to have justified his certification of the public need of all this particular taking.*" (Emphasis added).

"The 1953 policy for land acquisition resulted from the fact that *there is no general authority for the Corps of Engineers to acquire land other than for basic project purposes (navigation, flood control, etc.) and access for the public.* Yet *practice in taking land had, in the interest of recreation and fish and wild life, which Congress had considered only to be incidental, became so extensive* as to risk successful challenge by land owners in the courts. In its responsibility to Congress for carrying out the law and in its duty *to protect the Secretary of the Army from improper certification of public necessity for taking land for project purposes, the 1953 policy was essential in order to modify current field practices.*" (Emphasis added).

█ In this case, the Corps took the portion of the subject tract in question for purely recreational purposes when that was a use not authorized by law, and for many years did everything in its power to keep the facts from coming to ¨ght. Such a taking was in violation of the provision of the Fifth Amendment to the Constitution of the United States that no person shall be deprived of his property without due process of law. A matter of such grave and serious import cannot be given the brush-off treatment insisted upon by the government. The Courts are not powerless to get at the truth and to protect the landowner's rights in such a situation.

The Benbrook project is part of the flood control system on the Trinity River. The Clear Fork of the Trinity River is the smallest of the three main tributaries which form the Trinity itself. The other two are the West Fork of the Trinity River and the Elm Fork of the Trinity River. The Clear Fork flows into and becomes a part of the West Fork just north of the courthouse in Fort Worth. The West Fork then meets the Elm Fork at Dallas. The stream so formed is the Trinity River from Dallas to its mouth at the Gulf of Mexico near Liberty. The river and all its tributaries lie wholly within Texas. The Benbrook Dam on the Clear Fork is in Tarrant County, of which Fort Worth is the county seat. The Clear Fork has its source in the county adjoining Tarrant County on the north, only about fifty miles by direct line from Fort Worth. A navigation system on the Trinity River has been a subject of study by Congress for years, but it has never materialized.[11]

Study of flood control on the Trinity River in Texas began before 1920. Four preliminary examination reports submitted by the District Engineer to the Chief of Engineers between 1920 and 1935 brought no immediate results. The Flood Control Act approved June 22, 1936 (49 Stat. 1570) contained a provision authorizing and directing the Secretary of War "to cause preliminary examinations and surveys for *flood control*" (emphasis added) at a number of

---

11. Some of these matters are stated from the Court's judicial knowledge of the geographical features of the State. Granville-Smith v. Granville-Smith, 349 U.S. 1, 75 S.Ct. 553, 99 L.Ed. 773; Hoefs ∵.

Short, 114 Tex. 501, 273 S.W. 785, 40 A.L.R. 833; Humphreys-Mexia Co. v. Arseneaux, 116 Tex. 603, 297 S.W. 225, 53 A.L.R. 1147.

named localities, including the Trinity River in Texas. In compliance therewith the District Engineer submitted to the Chief of Engineers a preliminary report which was a revision of the four previous ones. Favorable consideration of that report by the Chief of Engineers and the Board of Engineers for Rivers and Harbors resulted in a decision that a survey for flood control be made in the area of Benbrook. Such a report, dated November 15, 1939, prepared by the District Engineer and approved in turn by the Division Engineer, the Chief of Engineers and the Board of Engineers for Rivers and Harbors, was transmitted to the Speaker of the House and became House Document 403–77th Congress, First Session (H.D. 403). Public Law 14–79th Congress authorized this project in conformity with H.D. 403. The legislation was an omnibus act which authorized many river, harbor and flood control projects over the nation. The following language of the statute was the authorization for the Benbrook Project:

"The improvement of the Trinity River and tributaries, Texas, for *navigation, flood control, and allied purposes* is hereby approved and authorized in accordance with the reports contained in House Document numbered 403, Seventy-seventh Congress." (Emphasis added).

This legislation contained no authority to take land for recreational purposes.

Funds for the project were appropriated by the following legislation: Act of Congress approved July 31, 1947 (Public Law 296–80th Congress), Act approved June 25, 1948 (Public Law 782–80th Congress), Act approved October 13, 1949 (Public Law 355–81st Congress), and Act approved September 6, 1950 (Public Law 759–81st Congress).

The Benbrook project described in H. D. 403 and authorized by Public Law 14 called for a gated spillway dam to be located on the Clear Fork at river mile 11.3. The storage capacity of the reservoir in acre feet of water was to be dead storage, 603; conservation storage, 30,-603; and controlled (combined conserva-

tion and flood control) storage, 208,850. The elevation of the spillway crest was 672 feet and the top of the dam was 702 feet. Approximately 6200 acres would have been required. The estimated cost of the land was $483,000.00 and of the entire project approximately $5,205,502.-00.

The project as built bore little resemblance to the one authorized by Public Law 14. The dam is located 3.7 miles farther upstream from Fort Worth at river mile 15. It is an uncontrolled spillway type. The notch crest of the spillway is 710 feet, and the main spillway crest is 724 feet. The top of the dam is 747 feet. The storage capacity in acre feet of water stated by the Definite Project Report is dead storage, 17,750; conservation storage, 88,250 (including 15,570 for sedimentation); and controlled storage, 410,013. Over 13,000 acres were acquired at a cost of about $2,500,000.00. The complete cost of the project was well over $14,000,000.-00.

After the necessary appropriations had been made by Congress, Secretary of the Army Pace signed three letters to the Attorney General in regard to the institution and conduct of condemnation proceedings to acquire land for this project. Those letters were dated July 10, 1950, October 20, 1950 and December 20, 1951, respectively. In each instance, the Secretary had received from the Corps of Engineers a proposed draft of the letter he was to sign and send to the Attorney General and some supporting documents such as maps, ownership lists and descriptions of the lands involved and the estates to be acquired therein. He had no other knowledge or information. His certifications of the purposes and public necessity for taking the lands and estates were not based on reasoned decisions. He merely accepted without question those decisions already made in each instance by the Corps of Engineers, and signed the instruments necessary to make them effective. The persons with the Corps of Engineers who had the most responsibility for making the rec-

ommendations on which the Secretary acted in matters relating to this project were: (1) Col. Woodrow Berge, Chief of Acquisition Division, Corps of Engineers, who had charge of acquiring lands necessary for projects under supervision of Corps. (2) Clare C. Casey, attorney in Real Estate Acquisition, Planning Division, Corps of Engineers, who recommended types of estates necessary to be taken in lands for projects under Corps. (3) Mark S. Gurnee, civil engineer serving the Chief, Operations Division of Civil Works of the Office, Chief of Engineers, U. S. Army, who made engineering recommendations on projects.

The office of the Chief of Engineers was in Washington and of the pertinent Division Engineer and District Engineer in Dallas and Galveston, respectively.

Pursuant to the request in the Secretary's letter of July 10, 1950, the Justice Department instituted the several suits necessary to acquire the estates in the lands described in the documents prepared by the Corps of Engineers which accompanied the letter.

The original complaint in this case, filed on July 28, 1950, stated that the lands described in the exhibit attached thereto were being condemned "pursuant to the provisions of the Act of Congress approved March 2, 1945 (Public Law 14-79th Congress), and other acts of Congress which are declaratory and amendatory", and that the purpose of the taking was "for use in connection with the construction and operation of the Benbrook Dam on the Clear Fork of the Trinity River." On the same day the suit was filed, Judge Davidson entered an order granting the United States the right to take immediate possession. On November 17, 1950, the Secretary filed a declaration of taking stating that the land sought to be condemned was "necessary adequately to provide for the construction and operation of Benbrook Dam and Reservoir on the Clear Fork of the Trinity River * * * *" Judgment was entered on the declaration of taking shortly after it

was filed decreeing the fee simple title to the lands involved in this case to be vested in the United States, subject to certain then existing easements for public roads, highways, railroads, public utilities and pipelines.

Tract B–108, as described in the original complaint, contained 1452 acres. An amendment to the complaint reduced the acreage to 1207, more or less. 560 of those acres lie below the 697.1 five year flood frequency line. Tract B–108 is carved out of a parent tract of about 2500 acres owned by Richardson at the time this litigation began. Only 48 acres out of the 2500 acres would have been taken under the project as authorized by Public Law 14. At various times after the enactment of that legislation and prior to the beginning of actual construction on the project, the Corps of Engineers had under consideration five different taking areas in the 2500 acre tract, requiring acreage of 1589, 1320, 1460, 1452 and 1207, respectively. Only the last two became involved in this case.

Within a short time after the suit was filed, the landowner received information that the taking of part of his land was for recreational purposes, and discovery proceedings were begun to get the proof. In order to avoid the effect of the decision in United States v. Meyer, 7 Cir., 113 F.2d 387 (1940), cert. den. 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459, the landowner had to show that the person who actually made the decisions relating to the taking was the Secretary himself, or some person or persons under him who were acting as his alter ego in the matter. Notice was given to take the deposition of the Secretary and interrogatories calculated to get all information and documents of the Department regarding the taking and the purpose thereof were served upon counsel for the government. No objection was made to such discovery at first. By asking for time to search for and get all the documents together, it was indicated that the government would comply with discovery. Government counsel did in

fact, on more than one occasion, agree that it would. However, when the pertinent documents from the files of the Corps of Engineers relating to this taking were assembled, counsel for the Department of Justice announced that they were changing their position and that the government would not submit to discovery. It was in reference to this effort to get the Secretary's testimony that General Sturgis made the statement to the congressional committee that "it could have been very embarrassing to have justified his certification of the public need of all this particular taking." The landowner filed a motion to dismiss, or in the alternative to abate the proceeding, and to restore the landowner to possession. Almost two years after this suit was filed Judge Davidson ended a long and patient struggle to get the government to comply with its discovery obligations by entering an order dated June 30, 1952, setting aside the previous order for the government's immediate possession of the portion of Tract B–108 in question, returning the landowner to possession, and abating further proceedings as to such tract until the government complied with discovery. The government sought to set aside the order on direct appeal and by petition for writs of mandamus and prohibition filed in the Court of Appeals. That Court held that the order was not one from which an appeal could be taken. It said further that while it had the authority to set aside the order by mandamus, it would not do so. United States v. Richardson, 5 Cir., 204 F.2d 552 (1953). The above matters are stated in summary fashion. The facts in regard to them are undisputed and are set out in detail in Judge Davidson's order of June 30, 1952, and in the opinion of the Court of Appeals. The following quotations from that opinion show the Court's reaction to the situation:

"* * * It [the order of June 30, 1952] simply withdrew and suspended the judicial assistance which petitioner had invoked ex parte against appellee. Its purpose was to stay the proceeding until appellant complies with the discovery process, as it had expressly agreed to do on February 11, 1952, when it invited the court to enter the order of February 28, 1952. * * *" 204 F.2d, at 555.

"* * * The court in the exercise of its inherent powers and in an effort to insure that appellee be not denied due process merely granted a stay of proceedings the overall effect of which was to condition appellant's right to proceed on compliance with the discovery process. * * *" 204 F.2d, at 556.

"* * * The appellant contends that if a writ is not granted it is left without a remedy and that the power of review will be defeated. Further that the order for examination constituted not only an abuse of discretion but an error as to the scope of the court's authority under the rules. These contentions are clearly without merit because the alleged unfortunate predicament of appellant is of its own making and the effect of the stay order requiring compliance with the discovery process can be subsequently determined on appeal in the final judgment dispositive of the whole cause. We purposely refrain from expressing our opinion on the merits of the orders of the district court and are content to say that if the judge did commit error it was invited error. This record affirmatively shows that the petitioner induced the court below to make each of the successive orders which culminated in the order of June 30, 1952, on the representation that by pursuing the suggested course appellee would be entitled to receive the information he was seeking, and it follows that the petitioner may not now challenge the trial court's authority. * * *" 204 F.2d, at 556.

After the case had remained dormant under the stay order for ten more years following the decision of the Court of Appeals, time had wrought enough changes to bring it back to life. The officials who would have suffered embar-

rassment by exposure of the general practice of the Corps of Engineers of taking land for unauthorized purposes were gone. That practice had been made public in the congressional hearings heretofore mentioned. A new administration had taken office. The landowner's motion reurging his previous motion to dismiss for failure to comply with discovery brought matters to a head. Sometime thereafter, the government announced that it would be willing to submit to discovery, and it did give the Court the impression of co-operating thereafter. While discovery progressed slowly due to the natural obstacles that resulted from the years of dormancy, it was finally completed as well as could be expected under the circumstances.

█ The matters relating to the discovery problems are reviewed only for the value they have on the issue of the purpose of the taking.[12] The Court draws the inference from these facts that the government was withholding evidence in its possession because it would show that recreational use was the real purpose of the taking.[13]

The facts developed by discovery show what General Sturgis meant in his statement to the congressional committee when he referred to "field practices" of the Corps of Engineers which brought about "improper certification of public necessity for taking land for project purposes." Almost simultaneously with the authorization in 1945 of the project which had been recommended by the Corps as more than adequate for navigation, flood control and allied purposes, the Corps, in line with its "practices on the liberal side to help * * * recreation", was preparing plans to take more than twice as much land as had been authorized, and much of that excess was for purely recreational purposes. Those plans contemplated construction of parks, permanent recreation facilities for daytime use and for camps, of cottages and tourist accommodations, and of concessions to be leased out. Elaborate maps were prepared showing the proposed location of these facilities. The portion of Tract B–108 in question was recognized as being ideally suited for recreational purposes. It was hilly almost from the edge of the lake, and the high bluffs overlooking the water were ideal building sites. A substantial part of the planned recreational facilities were intended to be on the excess land in Tract B–108 above the five year flood frequency line. The final recreation plans for the project were in the form of Appendix VIII E to the Definite Project Report prepared after the passage of Public Law 14.

12. There are much more important matters to be determined now than fixing the blame for the delay. While in the natural course of things the case would have been disposed of years ago if it had not been for the thirteen year impasse resulting from the government's refusal to submit to discovery, there has been delay since the government's change of position that cannot be charged to it. At one time it appeared that negotiations for settlement would bring the case to a close. Then followed a long period of illness of leading counsel for the landowner which turned out to be terminal. After his death, time had to be granted new counsel to become familiar with the case. Discovery took longer on account of the passage of time. Finally, a substantial delay has been due to a docket which has prevented the Court from taking out the several weeks necessary to study the voluminous record, including congressional proceedings of which the government has asked it to take judicial notice, and the authorities on the difficult legal questions here involved, and then to organize the case in such fashion that it could be put on paper within reasonable limits.

13. Withholding or failure to produce important evidence within the peculiar control of a party raises the inference that such evidence would be unfavorable to that party's cause. Kirby v. Tallmadge, 160 U.S. 379, 383, 16 S.Ct. 349, 40 L.Ed. 463 (1895); Foust v. Munson S. S. Lines, 299 U.S. 77, 86, 57 S.Ct. 90, 81 L.Ed. 49 (1936); Interstate Circuit v. United States, 306 U.S. 208, 226, 59 S. Ct. 467, 83 L.Ed. 610 (1939); Ford v. United States, 5 Cir., 210 F.2d 313, 317 (1954); United States v. Johnson, 5 Cir., 288 F.2d 40, 45 (1961).

As would be expected, the Corps did not make public that recreational use was the controlling factor in taking acreage in excess of that needed for the authorized purposes of the project. In a preliminary draft of cost estimates, certain proposed expenses were designated as being "for recreation." In the draft that was made public, that was changed to "preparation of master plan." There was a change of a similar nature in regard to the specified use of areas on the maps. At first, some of the lands were designated as "recreational areas," but that became "reservoir management" on the final plans. In addition, Appendix VIII E to the Definite Project Report was stamped "Not for Public Release." It was the only appendix so classified. It was withheld in the files of the Corps when the Definite Project Report with all its other appendices were made public. As an apparent justification for taking this large amount of excess land for unauthorized purpose, the Corps came up with a preposterous hypothetical storm that had no justification whatever.

The survey report of the Corps of Engineers which appears in H.D. 403 states that relatively very low rates of discharge per square mile obtain along the Trinity River throughout its entire course from Fort Worth to Galveston Bay, due in part to the shape and slope of the watershed and to climatological conditions which do not favor concentrated rainfalls over extensive areas on the watershed. The Clear Fork has a particularly small watershed of only 508 square miles. The stream itself is short, and there is not much drainage area on either side of it. Since it is only about 50 miles long, a watershed averaging about 10 miles in width would account for the entire 508 square miles.

A United States Weather Bureau was first established in Fort Worth in 1898, and records of precipitation in the Fort Worth area [14] have been kept for a number of years. The average annual rainfall in the Clear Fork watershed is less than 32 inches. The maximum 24 hour rainfall recorded at Fort Worth was 9.57 inches on September 3–4, 1922. Storms of that kind are very rare in the area. The highest flood on the Clear Fork resulted from 12.57 inches of rain over a five day period, April 23–28, 1922. However, the spillway specified in H.D. 403 was patterned after a rainstorm of much greater intensity at Ennis, Texas, some sixty miles southeast of Benbrook Dam. That storm in September, 1936, produced 14.70 inches of rain over a three day period at the center of the storm. The average over an area comparable to the Benbrook watershed was 13.25 inches. 19.87 inches, a figure representing approximately 150% of the 13.25 inches, was decided upon as an estimate of the worst possible storm which might occur over the Benbrook watershed in a 54 hour period. The dam so described in H.D. 403, patterned after such a hypothetical storm, would have created a reservoir capable of handling three times the volume of the maximum flood ever actually experienced on the Benbrook watershed. H.D. 403 said that, "The flood-control plan presented in this report is designed to * * * provide full flood protection to the leveed portions of the cities of Dallas and Fort Worth against the probable maximum flood." While this calculation provided adequate land for the basic project purposes, the Corps saw some excess land ideally suited for recreational purposes and set out to get it by the use of a hypothetical storm, the like of which has never been known in Texas.

Less than one month after the Benbrook project was authorized, the Corps of Engineers began assembling data for the hypothetical storm it used for determining the spillway height and the taking line for the project as later built. It considered a number of storms 150 to 200 miles nearer the Gulf of Mexico,

14. References of this kind to the "Fort Worth area" will include the Clear Fork watershed, as it is in the immediate vicinity of Fort Worth and has substantially the same precipitation.

most of which occurred during the hurricane season in the Gulf, and which were triggered by the Balcones Escarpment and the Edwards Plateau. The Edwards Plateau, which is the hilly section and table land northwest of San Antonio and Austin, is more than 150 miles, at its nearest point, from the Benbrook watershed. The Balcones Escarpment may be traced from Del Rio to Austin and to Waco, where it diffuses. No pronounced escarpment is visible within 90 miles from the Benbrook watershed. Wind currents forced upward sharply by these Balcones and Edwards escarpments bring moisture laden clouds in sudden conflict with cooler air, and heavy rainfall results. Also, the rainfall is heavier within 150 to 200 miles of the Gulf than it is in the Fort Worth area. The tropical hurricane storms entering Texas from the Gulf dissipate rapidly as they go inland, just as they do in all the coastal states. By using these storms and enlarging upon them, the Corps came up with a hypothetical storm of 28.2 inches of rain over a sixty hour period, even though the average annual rainfall on the Benbrook watershed is only 31.3 inches and the greatest storm of record there was the 12.57 inches over a 57 hour period. That record breaking hypothetical storm was the one used for the spillway design on the dam as built.

The particular storm used as a basis for the hypothetical spillway design storm was the one which occurred along the Balcones Escarpment near Thrall, Texas in September, 1921. Thrall is about 30 miles northeast of Austin, and around 130 miles from the Gulf. It is over 150 miles from Benbrook. The amount of rain which fell there is uncertain, as it has been increased substantially in recent years on the basis of unofficial observations. In all probability, it was about 18 or 19 inches over a period of three days. Based upon rainstorms in areas distant from Fort Worth, much nearer the Gulf, and having orographic

barriers non-existent in the Benbrook watershed and entirely different climatological conditions, the Corps came up with this hypothetical storm of 28.2 inches of rain over a 60 hour period. It was transported to the Benbrook watershed for spillway design purposes, even though the greatest storm of record there had been 12.57 inches over a 57 hour period and the entire average rainfall for a whole year was only 31.3 inches.

The Division Engineer of the Corps, whose headquarters at Dallas were only 40 miles east of Benbrook, was highly critical of this hypothetical storm criteria in his comments to the Chief of Engineers. He pointed out that the volume of rainfall during the Thrall storm had been greatly increased on the basis of unofficial information gathered years after it occurred, and that the revised rainfall estimate exceeded the *world record* for precipitation for periods of 2 to 18 hours. He pointed out that Thrall was 150 miles nearer the Gulf than Fort Worth and was on the Balcones Escarpment. He commented that the hydrological study was very theoretical, and that care should be taken about transposing it to the Benbrook watershed. He concluded that "it is believed that this storm should be materially reduced if used as a basis for spillway design in the upper Trinity River basin \* \* \* where storms would not be affected by topographic features such as the Balcones Escarpment."

The policy group in the Corps ignored the Division Engineer's advice and proceeded with the hypothetical 28.2 inch storm. Even that, however, record breaking as it was, did not justify the height of the spillway necessary to get the land the Corps wanted for recreational purposes. That shortcoming was met by assuming that the reservoir was filled to capacity, when the 28.2 inch storm began, on account of another big storm and their inability to open the dam gates.[14a] That was the kind of design

14a. None of the hypothetical storm spillway design criteria made any allowance

for the well established reservoir management practice of lowering the level of the

criteria that the Corps used to establish the 741 foot take line. There was no justification in fact or in reason for such criteria.

That the land was never necessary for the project is shown by the fact that the witnesses from the Corps of Engineers admitted in their testimony that the possession and control of it by the landowner since the order of June 30, 1952, has not hampered or interfered with the operation of the dam or reservoir.

The landowner has had the title to 647 acres of land taken away from him as the result of two unauthorized actions of the Corps of Engineers and either one them, standing alone, is sufficient basis for invalidating the taking.

■■ The Court has been unable to find any case where land has been wrongfully taken as a result of radical, unauthorized changes in a project. It is fundamental, however, that a condemning agency can take a person's land only when it has legal authority to do so. The project as built was entirely different from the one which was authorized by Public Law 14. The modifications were too significant and radical to come within the authority granted by the Statute. The following is quoted from 33 U.S.C.A., Sec. 70lb-8:

"It is declared to be the policy of the Congress that the following provisions shall be observed:

"No project or any modification not authorized, of a project for flood control or rivers and harbors, shall be authorized by the Congress *unless a report for such project or modification has been previously submitted by the Chief of Engineers*, United States Army, in conformity with existing law." (Emphasis added).

33 U.S.C.A., Sec. 701m provides that the Chief of Engineers is "authorized in his discretion to modify the plan for any dam or other work heretofore or hereafter authorized so that such dam or work will be smaller than originally planned with a view to completing a useful improvement within an authorization * * *." Congress has some protection in that kind of modification, but it is difficult to see how a much larger dam could be completed within an authorization. The statute also imposes the further restriction that the modified dam "shall be located on the chosen site." The one in this case was almost four miles from the authorized site. This is answer enough to the government's claim that the subsequent granting of appropriations for the project impliedly authorized the project as built, but there is more. The various appropriations acts heretofore cited provide that the money granted is for projects "heretofore authorized", and expressly state that "no part of this appropriation shall be expended for any preliminary examination survey, project or estimate not authorized by law." Exhibits offered in evidence, as well as the testimony of the government's witness, Gurnee, of the Corps of Engineers, show that it was not the intention of the Corps to direct the attention of Congress to the modifications. If Congress had considered that it was being properly advised on the way the Corps was handling these projects, there would have been no occasion for the proceeding known as, "Investigation of the Corps of Engineers Civil Works Program by a Sub-committee of the Committee on Appropriations, House of Representatives, 82d Congress, First Session." One of the fundamental purposes of that investigation was to determine why the cost of the projects was always so much greater than the estimate given to get authority for the project.[15]

water during potential flood months. The only large floods in the Fort Worth area have occurred in the months of April, May and September.

15. The subcommittee found that one of the reasons flood control projects had been

costing so much more than anticipated by Congress was that the reports of the Corps of Engineers to the Appropriations Committee after the projects were once authorized were inadequate to keep the Appropriations Committee informed. The importance of having the full information

The Corps claimed it was due to the general rise in prices. The subcommittee found that over 30% of the increase could not be justified on that basis. The statistics in the report show that most of that 30% was the result of modifications which substantially increased the size of the project.

The cases on this matter of implied authority are scarce, probably because so few people would have a right to bring a judicial action raising the question. Maiatico v. United States, 112 U.S.App. D.C. 295, 302 F.2d 880 (1962), is most nearly in point. In that case, the government sought to condemn certain property in the District of Columbia. The Administrator of General Services was the administrative officer who made the determination for the necessity of taking and who filed the declaration of taking. The landowner successfully contested the condemnation on the ground that the necessary authority for the taking did not exist. The government argued that it had express authority, and in the alternative that authority had been impliedly given under the act making appropriations for the General Services Administration. In rejecting such contentions, the Court of Appeals said at pp. 885–886:

"The Government would have us say that the general provision of the Second Supplemental Appropriation Act supplants the limitations of the Public Buildings Act of 1959 and the Appropriation Act which had so carefully been linked to the former. Carried to its logical conclusion, the Government's construction would sweep away all pre-existing requirements. Any such inversion of the purpose of Congress would be in direct conflict with the governing principle to be applied here. 'However inclusive may be the general language of a statute, it "will not be held to apply to a matter specifically dealt with in another part of the same enactment. * * * Specific terms prevail over the general in the same or another statute which otherwise might be controlling". Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 [52 S.Ct. 322, 76 L.Ed. 704].' "

Since the project as built was so grossly beyond the limits of the project created by Public Law 14, there was no authority to acquire the land sought to satisfy the radically excessive modifications.

The 48 acres of Richardson land required by the project created by Public Law 12 do not lie within the 647 acres of Tract B–108 now in question. The claimed necessity for the taking of such 647 acres arose from the construction of a project so totally different from the one contemplated by the statute that it amounted to an unauthorized project. The taking of the portion of Tract B–108 here in question was therefore invalid for lack of authority. Mariatico v. United States, supra.

The government's fears of dire results generally from such a holding are not justified. It will not have to abandon the project and return all heretofore acquired land to the former owners. Nichols on Eminent Domain, 2d Ed. sec. 35.[16]

at the right time is emphasized in the following quotation from the Report of August 16, 1951 from the Subcommittee on Deficiencies and Army Civil Functions to the Committee on Appropriations, House of Representatives, Eighty-second Congress, First Session, in the Investigation of the Corps of Engineers Civil Works Program:

"Even worse from the national standpoint is the fact that the $800 million increase, if known to Congress in whole or in part when initial constructions funds were appropriated, would have weighed heavily in the action which Congress took then. That was the hour of decision. At that time the economic justification for many projects hung in delicate balance. Any reported cost increase would have had a profound effect on the crucial congressional decision of whether to initiate construction. Undoubtedly, some of the 182 projects would not be under construction today if Congress had had reliable information from the Corps of Engineers, developed by competent engineering planning."

16. The following is quoted from the text cited:

"The constitutional provisions which affect the exercise of the power of eminent

The taking is also invalid because it was for a purpose not permitted by statute. This is a recognized ground for contesting the right of the government to condemn. Catlin v. United States, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911 (1945); Maiatico v. United States, supra. The landowner in the Catlin case contested the authority for the taking, and appealed from the order on the declaration of taking. The Supreme Court held that the order was not an appealable one, but recognized that the landowner still had the right to contest the authority for the taking. The following quotation from the opinion shows that the Court repeatedly recognized the owner's right to challenge the taking on the ground that it was for a purpose beyond statutory limits:

"The exact effect of these provisions is not entirely clear. But we find nothing in the statute to indicate that Congress intended to deprive the owner of all *opportunity to challenge the validity of the taking for departure from statutory limits.* * * * " 324 U.S., at 240, 65 S.Ct., at 637.

"We think the purpose was to leave intact the owner's remedy existing before the statute was adopted * * * " 324 U.S., at 240, 65 S.Ct., at 637.

"While the language and the wording of the act are not wholly free from doubt, we see no necessary inconsistency between the provisions for transfer of title upon filing of the declaration and making of the deposit and at the same time preserving the owner's preexisting right to question the validity of the taking as not being for a purpose authorized by the statute under which the main proceeding is brought. That result may be reached if the statute is construed to confer upon the Government, upon occurrence of the events specified, only a defeasible title in cases where an issue concerning the validity of the taking arises. * * * The alternature construction, that title passes irrevocably, leaving the owner no opportunity to question the taking's validity or one for which the only remedy would be to accept the compensation which would be just if the taking were valid, would raise serious question concerning the statute's validity. * * * * " 324 U.S., at 241, 65 S.Ct., at 637.

In the *Maiatico* case, the Court said 302 F.2d at p. 886:

"Nothing we have said is in derogation of the vast and admitted power of the Government for its own sovereign purposes to appropriate private property, so long as the owner is awarded 'that just compensation which the Constitution requires.' Despite appellants' allegations that the taking is unnecessary, it is not for us to determine whether or not a particular project be desirable. That is within the power of the Congress, however, subject to the right of the owners 'to challenge the validity of the taking for departure from the statutory limits.' "

domain are not intended as abstract limitations upon the power of the government so that any statute which violates such provisions is necessarily and for all purposes void, and the acts of any public officials thereunder are necessarily illegal. On the contrary, the provisions were intended solely for the protection of the individual property owner from the aggressions of the government in concrete cases. It necessarily follows that, so far as the limitations upon the power of eminent domain are concerned, no one but the owner of property whose constitutional rights are violated can object to the validity of a statute on the grounds that it authorizes the exercise of eminant domain in a manner forbidden by the constitution, and *if, when property is taken under an unconstitutional statute, the owner sees fit to waive his right to object, no one else has any ground to complain, and the taking is as effective to pass the title to the property as if all the requirements of the constitution had been complied with. Such waiver may be by parol, or it may be implied from the owner's acceptance of the compensation.* However, an owner, by merely filing a claim for damages is not estopped from contesting the constitutionality of the taking."

Bishop v. United States, 5 Cir., 288 F.2d 525, 527, 528 (1961), citing the *Catlin* case, says that the Declaration of Taking Act is a statute "which has constitutional overtones, and \* \* \* is to be read in that light", and that it "could not have been intended to whittle down the property owner's rights."

The government makes no argument against the rule that a landowner can challenge the validity of a taking "for departure from the statutory limits." The *Catlin* case is cited with no indication of disapproval in Berman v. Parker, 348 U.S. 26, 36, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the authority most heavily relied upon by the government. The question here is whether the courts have the power to get at the truth if the administrative office making the determination does not admit that the taking is for a purpose beyond statutory limits. The government argues that the administrative officer's statement of the purpose of the taking is conclusive on the landowner, regardless of what the truth is.

The general rule is that the declaration of taking of the proper administrative officer is not subject to judicial review. City of Oakland v. United States, 9 Cir., 124 F.2d 959 (1942), cert. den. 316 U.S. 679, 62 S.Ct. 1106, 86 L.Ed. 1753; United States v. 243.22 Acres of Land, 2 Cir., 129 F.2d 678 (1942), cert. den. 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558; United States v. Montana, 9 Cir., 134 F.2d 194 (1943), cert. den. 319 U.S. 772, 63 S.Ct. 1438, 87 L.Ed. 1720. There are, however, a number of cases, state and federal, which recognize that while the scope of review is limited, it exists where the ac-

tion of the official issuing the declaration acted arbitrarily, capriciously or fraudulently.[17] United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946); McKendry v. United States, 9 Cir., 219 F.2d 357 (1955); Eden Memorial Park Ass'n v. United States, 9 Cir., 300 F.2d 432 (1962); United States v. 91.69 Acres of Land, 4 Cir., 334 F.2d 229 (1964); State Road Department of Florida v. Southland, Inc., Fla.App., 117 So.2d 512; Trustees of Schools of Tp. 37 North, Range 11, Cook County v. Sherman Heights Corp., 20 Ill.2d 357, 169 N.E.2d 800; County Board of School Trustees of Macon County p. Batchelder, 7 Ill.2d 178, 130 N.E.2d 175; Dahl v. Northern Ind. Pub. Ser. Co., 239 Ind. 405, 157 N.E.2d 194; Mook v. Sioux City, 244 Iowa 1124, 60 N.W.2d 92; Board of Commissioners of Tensas Basin Levee Dist. v. Franklin, La., 54 So.2d 125; State Roads Commission v. Franklin, 201 Md. 549, 95 A.2d 99; City of Greenwood v. Gwin, 153 Miss. 517, 121 So. 160; Aeroville Corp. v. Lincoln County Power Dist., 71 Nev. 320, 290 P.2d 970; Bergen County v. S. Goldberg & Co., Inc., 76 N.J. Super. 524, 185 A.2d 38; Saso v. State of New York, 20 Misc.2d 826, 194 N.Y.S. 2d 789; Jones v. Village of Maumee, 20 Ohio App. 455, 152 N.E. 765; Roosevelt Hotel Building Co. v. City of Cleveland, 25 Ohio App. 53, 155 N.E. 233; Port of Umatilla v. Richmond, 212 Or. 596, 321 P.2d 338; Bookhart v. Central Electric Power Co-op., 222 S.C. 289, 72 S.E. 576.[18] If judicial review exists for those purposes, there is no question that it does for takings which are departures from statutory authority. The government re-

---

17. The government has devoted a good portion of its briefs to the discussion of whether the Court has to find that the parties making the decisions in this case were guilty of fraud. The Court deems it unnecessary to decide whether the officials acted maliciously. It could be that subjectively they had what they considered lofty motives in taking the excess Richardson land for recreational use by the public, just as a policeman might consider that his search for the truth would justify coercion from an accused in his custody.

Regardless of what their motives were, they were taking private property from people for purposes they knew were not authorized by law. In so doing, they were violating their constitutional rights under the Fifth Amendment.

18. Federal cases control in condemnation suits in the federal courts. The state cases are cited to show the widespread recognition of the exception to the general rule that administrative determinations on taking are not subject to judicial review.

lies upon Berman v. Parker, supra, and a number of cases by the Courts of Appeals along the same line. In each one of those cases, the taking was for a lawful purpose and the landowner was challenging the administrative official's determination on one or more of the grounds that the taking was unwise, not desirable, inexpedient, or the product of poor judgment or careless planning. The purpose of the taking was lawful, and the landowner was asking the court to review the judgment of the official. Those cases presented an entirely different question from the one posed here where the truth was that the taking was a departure from statutory authority.

The Fifth Amendment to the Constitution of the United States guarantees that "No person shall be * * * deprived of life, liberty, or property, without due process of law * * *." Under that guaranty, the land here in issue was Richardson's to enjoy until he chose to dispose of it voluntarily or until he was divested of it for a purpose and in the manner provided by law. The unauthorized taking of his property was a violation of his rights under this due process clause. United States v. Carmack, supra;[19] Swan Lake Hunting Club v. United States, 5 Cir., 381 F.2d 238 (1967), citing O'Neill v. Leamer, 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249. The government cannot dispute that the landowner here has the due process guaranty. It says that the Secretary's certification of the purpose of the taking is conclusive and that therefore the question of the legality of the taking cannot be reached. This due process guaranty would be a hollow one, indeed, if it could be defeated by the impenetrability of a paper shield. The federal courts have not let record or documentary certifications prevent them from getting at the truth to determine whether the other two due process guaranties were being violated. There is no reason why the rule should be any different where it is property rather than life or liberty, as it is the obvious purpose of the Constitution to set up the fundamental safeguard of due process for all three as a bulwark against oppression. It is fundamental that the power of eminent domain is a necessary attribute of sovereignty, but it is an awesome power which should be exercised only within the framework of the law. It is for Congress, not the Corps of Engineers, to decide the purposes for which private property can be taken under eminent domain. Such a process assures that the decision will be made publicly, by elected representatives of the people, after an opportunity to be heard, instead of secretly, as was done by the Corps here, with the potentially revealing documents marked "Not for Public Release." To say that there can be no inquiry as to the truth of the certification of the purpose of the taking would encourage abuse of the power of eminent domain. It may well be that the Corps felt that it had this protection, and that such feeling was responsible for the admitted widespread proportions of their unauthorized land acquisition practice.

The rule announced in the cases cited severely restricting inquiry into the administrative officer's determination of the purpose of a taking do not reach the question at issue here. They do not say that an inquiry cannot be made as to the correctness of the certification of the purpose. The effect of the holdings in those cases is that where the actual purpose of the taking is correctly certified, and the purpose is one authorized by law, the determination to take cannot be challenged. That is not the case here. The Secretary certified that the land was being taken for the basic project purposes of floor control and navigation, when the real purpose was recreation. Even though the Secretary made the erroneous certification innocently, it was tainted by

---

19. " * * * The Fifth Amendment, in turn, provides him with important protection against abuse of the power of eminent domain by the Federal Government." 329 U.S., at 236–237, 67 S.Ct., at 255, 91 L.Ed., at 214.

the excesses of the Corps which actually made the determination. By accepting the Corps' decisions and recommendations carte blanche, the Secretary took them with whatever infirmities they had as a result of violations of landowner's constitutional rights. The certification of the purpose of a taking is subject to judicial review to ascertain whether it correctly states the true purpose, when there is a reasonable basis for a claim that the property involved is being taken in violation of the Constitution. There can be no better example of the soundness of such a rule than that which appears in the Notes on Land Acquisition, furnished by General Sturgis in the Hearings before a Subcommittee on Government Operations, House of Representatives, Eighty-fifth Congress, First Session, in the Investigation of the Army-Interior Land Acquisition Policy, in 1957.[20]

After the hearing above mentioned, Congress passed legislation authorizing the return to the owners involved in the Benbrook project of all lands taken above elevation 697.1, subject to a perpetual flowage easement and other restrictions.

Many owners got such a return; but, as would be expected, Richardson was not one of them. He had instigated some of the investigation. The excess in Tract B–108 above elevation 697.1, which was tagged during the recreational planning stages as being ideally suited for building sites on account of its being on the "high bluffs", became most essential for basic project purposes. In their efforts to support such necessity, the Corps at one time suggested that it was needed as a site for burning brush—more than a section of land of this type for brush burning!

▮ Since the early stages, the landowner has waived his right to question the taking as to the 560 acres, more or less, in Tract B–108 below elevation 697.1, as he had a right to do. See quotation from Nichols on Eminent Domain in footnote 16. The unconstitutional taking of the 647 acres, more or less, in such tract above elevation 697.1 vested in the United States with only a defeasible fee. Catlin v. United States and Maiatico v. United States, both supra. The title to such 647 acres should be divested out of

20. "Conference with Secretary Stevens in early May 1953; I was called to Secretary Stevens' office around May 5, 1953, and found with him a Mr. Johnson, attorney to (sic) Mr. Sid Richardson. After introducing Mr. Johnson, Mr. Stevens reminded me of his responsibility under the law for final certification of necessity in the public interest for the taking of land for project purposes, and that he was troubled by the general extent of the dissatisfaction he was aware of throughout the country by individuals who had been deprived of their property adjacent to our reservoirs, which property lay clearly outside the flowage line, sometimes as much as a mile away, *this property being taken under the guise of public access*, block-out, severance and similar *reasons that were in reality subterfuges for extending legal authority for acquiring land for recreation* and other purposes that would, and *were, not supportable by the courts in interpreting the law.*

"Therefore, the responsible authority charged by Congress for the certification of every taking, *Mr. Stevens said*

*he was deeply troubled by the Chief of Engineers' application of the various flood-control laws over recent years.* He said that he was not personally against recreation for the public or the acquisition of land for fish and wildlife, or any other purpose for the public good; *but if such purposes were the intent of Congress, Congress should so express itself by general authorizing legislation.* He supported this by asking me if there had not been cases of individual projects where Congress specified such purposes in the legislation authorizing such projects to which I answered affirmatively that there were; but a very few.

"Mr. Stevens then said that while he was not familiar in detail with acquisition determinations and actions in the case of Benbrook Reservoir, *he was sufficiently informed to conclude that this was a particularly flagrant case of the general observation he had just cited,* and he asked me to hear what Mr. Johnson had to say generally about the acquisition policy there and specifically as to the case of his client, Mr. Richardson." (All emphasis added) (page 423).

the United States and vested in the defendant landowners.

The government claims that none of the statements or actions of its officials offered in evidence is binding on it. The Court considers that evidence as to things said or done in the planning and formulation of the project is admissible on the ground, among others, that they were res gestae of the project itself. Aside from matters of that kind, the Court's findings and conclusions would be the same without the evidence questioned by the government.

Judgment will be entered in accordance with the Court's findings and conclusions.