No. 1316. 2,606.84 Acres of Land in Tarrant County, Texas, et al. *v.* United States. C. A. 5th Cir. Certiorari denied.

Mr. Justice Douglas, whom Mr. Justice Black joins, dissenting.

In 1945 Congress authorized the Benbrook Dam and Reservoir Project on the Clear Fork of the Trinity River near the southwest outskirts of Fort Worth, Texas. The authorization stated in part:

> "The improvement of the Trinity River and tributaries, Texas, for navigation, flood control, and allied purposes is hereby approved and authorized in accordance with the reports contained in House Document Numbered 403, Seventy-seventh Congress." § 2, 59 Stat. 18.

The project described in House Document 403 called for a gated spillway dam to be located on the Clear Fork at river mile 11.3. The storage capacity of the reservoir in acre feet of water was to be dead storage, 603; conservation storage, 30,603; and controlled (combined conservation and flood control) storage, 208,850. The elevation of the spillway crest was 672 feet and the top of the dam was 702 feet. Approximately 6,200 acres of land would have been required. Projected cost of the land was $483,600 and the entire project was estimated to cost about $5,205,502.

The project that was subsequently built bears little resemblance to the one described in House Document 403. It is located 3.7 miles farther upstream at river mile 15. It is an uncontrolled spillway type. The notch crest of the spillway is 710 feet, and the main spillway crest is 724 feet. The top of the dam is 747 feet. The storage capacity in acre feet of water as stated by the Definite Project Report is dead storage, 17,750; conservation storage, 88,250; and controlled storage, 410,013. Over 13,000

acres of land were acquired at a cost of about $2,500,000; total project cost was well over $14,000,000.

This case arose when the United States filed a petition for condemnation of petitioners' land in federal district court. Some 1,207 acres were finally sought. Of this land some lies below the elevation of 697.1 feet (conservation pool elevation, the maximum water level of the pool below flood stage). That land below elevation 697.1 is not involved in the case here. But some 647 acres lie above that elevation. The Army Corps of Engineers took that land for recreation purposes. Petitioners claim that taking is not authorized by law. Petitioners have consistently contended that the land was taken for recreation purposes and that was not authorized under statutes authorizing the Benbrook Project and that the project, as built, was so radically and materially changed that it had to be resubmitted to Congress for a new authorization.

Shortly after the Government filed its condemnation suit, petitioners' predecessor, Richardson, instituted discovery proceedings. The Secretary of the Army refused to submit and the District Court abated the cause with bare legal title left in the Government and possession restored to Richardson pending the Government's obedience to the court's discovery orders. The Court of Appeals for the Fifth Circuit affirmed this action. *United States* v. *Richardson,* 204 F. 2d 552 (1953). The Government later submitted to discovery and discovery showed, as General Sturgis, former Chief of the Corps, admitted to a congressional subcommittee, that "it could have been very embarrassing to have justified his [the Secretary's] certification of the public need of all of this particular taking." [1]

---

[1] Hearings on Army-Interior Reservoir Land Acquisition Policy before a Subcommittee of the House Committee on Government Operations, 85th Cong., 1st Sess., 422 (1957).

As a result of a congressional investigation and discovery in this case certain facts about this case emerged. Petitioners allege that prior to 1953 the Corps had a "field practice" of taking more property than was authorized in order to create land for purely recreational purposes. According to the District Court, 309 F. Supp. 887, almost simultaneously with the 1945 authorization the Corps in the present case began its plans for twice as much land as had been authorized with much of the excess for purely recreational purposes. Maps were prepared showing the locations of the recreational facilities. The final recreational plans for the project were in the form of Appendix VIII E to the Definite Project Report. In preliminary drafts certain proposed expenses were designated as "for recreation," but in final drafts they were credited to "preparation of master plan." Similarly, the maps initially showed "recreational areas," but in final stages the label was changed to "reservoir management." In addition, Appendix VIII E was stamped "Not for Public Release." According to the District Court, no other appendix was so classified. *Id.*, at 896.

Justification for the excess land was necessary. The District Court found that to accomplish this, the Corps created the Great Storm and used its Great Storm as a basis for its spillway design on the dam as built. It is said that the storm will indeed be great, if it ever comes, dumping some 28.2 inches of rain in the area within a 60-hour period. The likelihood of this happening is said not to be high. Average annual rainfall in the area is 31.3 inches. The greatest storm ever recorded there dropped 12.57 inches in a 57-hour period. The District Court says the Great Storm was invented from a storm near Thrall, Texas, in 1922. Thrall is 130 miles from the Gulf of Mexico and over 150 miles from the Benbrook Project. The Thrall storm dropped an uncertain amount of rain and reports of the amount increased as

the years passed. The District Court found that in all probability about 18–19 inches were dropped in a three-day period in Thrall.

But even with the Great Storm, recordbreaking though it would be, the District Court found that the Corps could not justify the height of the spillway necessary to obtain the land it wanted for recreational purposes. But one Great Storm deserves another and that, it is said, is what the Corps postulated. The Great Storm was assumed to come right after another big storm had dropped large amounts of rain in the area, thus preventing any opening of the dam gates. Furthermore, none of the spillway design criteria made any allowance for the well-established reservoir management practice of lowering the level of water during potential flood months. And large floods have occurred only during three months of the year in the Fort Worth area.

The District Court found that the taking of the land for recreational purpose was lawless. The Court of Appeals for the Fifth Circuit reversed, concluding that recreational development was an "allied purpose" within the meaning of the project authorization and also concluding the modifications were proper and needed no further authorization. 432 F. 2d, at 1291.

From the Solicitor General's brief in opposition there is much we do not know about the Government position. There have been congressional inquiries into the Corps' actions in taking more land than necessary for projects which it is building. Hearings on Army-Interior Reservoir Land Acquisition Policy before a Subcommittee of the House Committee on Government Operations, 85th Cong., 1st Sess. (1957); Report of the Subcommittee on Deficiencies and Army Civil Functions of the House Committee on Appropriations, Investigation of Corps of Engineers Civil Works Program, 82d Cong., 1st Sess.

(Comm. Print 1951). The Solicitor General does not discuss the effect of these reports on this litigation.

Further, there is some relevant statutory material which the Solicitor General does not discuss or cite. Section 701b–8 of 33 U. S. C. states that "[n]o . . . modification not authorized, of a project . . . shall be authorized . . . unless a report for such . . . modification has been previously submitted by the Chief of Engineers . . . in conformity with existing law." Section 701m authorizes the Corps to make a dam smaller than originally planned, but does not authorize making a dam larger, as happened here. Section 701 requires reports for projects or modifications covering, *inter alia,* "the extent and character of the area to be affected by the proposed improvement" and "such other uses as may be properly related to or coordinated with the project."

Finally we do not know to what use the land has been put. If there is no development yet, what are the current plans? The National Environmental Policy Act of 1969, 42 U. S. C. § 4331 *et seq.* (1964 ed., Supp. V), requires environmental impact statements for proposed projects.[2] So far as we are advised, no such statement has been filed.

The questions raised are of such great public importance that I dissent from a denial of certiorari.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

The National Environmental Policy Act of 1969, 83 Stat. 852, provides in § 102 the following:

SEC. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted

---

[2] The relevant portions of this Act are set forth in an Appendix to this dissent.

and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop

and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by title II of this Act.